**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RALPH INTERNATIONAL THOMAS,
   *Petitioner-Appellee,*

v.

KEVIN CHAPPELL, Warden of San
Quentin State Prison,
   *Respondent-Appellant.*

No. 09-99024

D.C. No.
3:93-cv-00616-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
August 11, 2011—San Francisco, California

Filed May 10, 2012

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge O'Scannlain

**COUNSEL**

Gerald A. Engler, Senior Assistant Attorney General, State of California, San Francisco, California, for the respondent-appellant.

A. J. Hutchins, Berkeley, California, for the petitioner-appellee.

**OPINION**

GRABER, Circuit Judge:

Respondent, the Warden of San Quentin State Prison, appeals from the district court's grant of a writ of habeas corpus to Petitioner Ralph International Thomas. The California Supreme Court held that Petitioner received constitutionally ineffective assistance of counsel at his trial but that trial counsel's deficient assistance did not prejudice Petitioner. The district court disagreed with the latter conclusion, held that Petitioner had established prejudice, and granted the writ. We affirm.

FACTUAL AND PROCEDURAL HISTORY

In the early morning hours of Friday, August 16, 1985, some person or persons murdered Greg Kniffin and Mary

Gioia near a homeless encampment named Rainbow Village. Both victims had been beaten badly, shot in the neck by a high-powered firearm at point-blank range, and then dragged into San Francisco Bay. After sunrise on the morning of the murders, a jogger noticed a body floating in the Bay and contacted the police. The police recovered Mary's body and, the next day, police divers discovered Greg's submerged body. Ten days after the murders, the police arrested Petitioner.

## A. *Trial*

### 1. *The Prosecution's Case*

At trial, the prosecution readily admitted that it had no direct evidence of Petitioner's guilt. For instance, there had been no witnesses to the crimes, and no murder weapon was ever found. The prosecution did present, however, considerable circumstantial evidence that supported the conclusion that Petitioner had committed the murders. The evidence presented by the prosecution tended to demonstrate the following facts.[1]

Rainbow Village was an undeveloped landfill area near the Berkeley, California, marina. The City of Berkeley had set aside the area for persons living in their motor vehicles, and the City provided some rudimentary services such as a sink and running water. The City rented out approximately two dozen stalls for vehicles, and a community of residents lived in Rainbow Village on a generally permanent basis. Petitioner, a well-known resident of Rainbow Village, lived in his car.

In addition to the residents, other persons commonly spent the night just outside the official confines of the Village. In

---

[1] We recount the facts only to the extent necessary for our review. For a more complete description, *see People v. Thomas*, 828 P.2d 101 (Cal. 1992).

particular, Rainbow Village was a popular stop-over point for persons, commonly referred to as "Deadheads," who followed the Grateful Dead band on tour. At the time of the murders, approximately ten to thirty Deadheads were staying in or adjacent to Rainbow Village in an assortment of motor vehicles, including a bus known as the "Dead On" bus.

The murder victims, Greg and Mary, were associated with the Deadheads. Greg had been traveling with the Deadheads on the Dead On bus for more than a month. Mary previously had been visiting a private home in Berkeley, but she had been staying on the Dead On bus during the week before the murders. Greg was 18 years old, and Mary was 22 years old.

Petitioner possessed a high-powered rifle, which he usually stored in a case in the rear part of his car, where he also stored a "tupperware"[2] container holding ammunition. On the evening before the murders, sometime around dusk, Petitioner fired his rifle at a flag flying over one of the vehicles parked in Rainbow Village.

Later that night, a group of people gathered to party in and around several vehicles parked in Rainbow Village. The group included both permanent residents and Deadheads; in particular, the group included Petitioner, Mary, and several others. At some point late in the evening, most of the party-goers, including Petitioner and Mary, left to purchase beer. On the way back to Rainbow Village, they stopped to pick up Greg, who was walking along the side of the road. Upon returning to Rainbow Village, the group—which now included Petitioner, Mary, and Greg—resumed drinking and talking. Petitioner retrieved a bottle of whiskey from his car and drank from that; others drank beer.

---

[2]Because the witnesses used the word "tupperware," we follow that convention.

In the early morning hours, Greg and Mary announced that they were going to take a walk, and they left the party. Petitioner left at about the same time, without saying where he was going. The party disbanded.

Around the same time, or shortly thereafter, a Rainbow Village resident named Vincent Johnson saw Greg, Mary, and Petitioner standing along the side of the access road that led into Rainbow Village. According to Vincent, Petitioner had a "grim expression," did not look "happy," and possibly appeared to be "angry" or "pissed off." Of the witnesses who testified at trial, Vincent was the last person to see Greg and Mary alive.

Petitioner was next seen several hours later, around sunrise, near the frontage road a short distance from Rainbow Village. According to the witness, Petitioner was bent over some trash bags, apparently looking through the trash. Another witness saw Petitioner a few hours later, at about 9:00 a.m., at an intersection in Berkeley. The witnesses who saw Petitioner in the morning described him as wearing a pair of camouflage pants, whereas the witnesses who saw Petitioner the previous evening described him as wearing a pair of jeans.

By about 10:00 a.m., Petitioner returned to Rainbow Village and reported to several residents of Rainbow Village that his rifle was missing. Shortly thereafter, Rainbow Village resident Harry Shorman rode by on his bike, announcing that a body had been found in the Bay.

Many people, including Petitioner, gathered to watch the police's efforts to retrieve the body. During the recovery process, a police detective heard Petitioner state, apparently to no one, "[t]hat's Mary." When Petitioner made his comment, Petitioner was standing approximately 45 feet from the body, and only part of the body and its clothing could be seen. The detective who overheard Petitioner's comment testified that, at the time Petitioner made his comment, the detective could

not even discern the gender of the body. The body was later identified as Mary.

The detective then questioned Petitioner about the events of the previous evening. Petitioner's account of the evening up to the end of the party generally accorded with the description above: He had been partying with a group of people and had gone on a beer run, and the party eventually disbanded. Petitioner said that, after he left the party, he decided to walk to a liquor store in Berkeley. On leaving Rainbow Village, he encountered Greg and Mary by the side of the access road. Greg asked for a match, and the three of them smoked marijuana together. Petitioner then continued on his trip to the liquor store, leaving Greg and Mary behind.

Petitioner then described a series of long walking trips that the prosecution labeled implausible. According to Petitioner, he first walked to the liquor store in Berkeley, but it was closed. He returned to Rainbow Village and then decided to walk to People's Park in Berkeley to purchase some marijuana. Unable to find a marijuana seller at the park, he returned to Rainbow Village again and decided to do his laundry. He then walked to a laundromat, did his laundry, and returned to Rainbow Village. According to the prosecution's calculations, the total mileage logged by Petitioner was 16.8 miles. The detective took down Petitioner's information and ended the conversation. At trial, police officers assigned to the areas described by Petitioner testified that they did not recall seeing Petitioner.

Later that day, Petitioner brought Rainbow Village resident Thomas Medlin a gun-cleaning kit and asked Medlin to store it for him. Medlin initially agreed and accepted the kit. But when Petitioner returned with a tupperware container consistent in description with a tupperware container that Petitioner used to store ammunition, Medlin returned the gun-cleaning kit and told Petitioner that he would not store anything for him. Petitioner also told Medlin that he had been "dumpster

diving" throughout the previous night, which the prosecution argued conflicted with Petitioner's story of his travels in Berkeley for liquor and marijuana, told to the police detective.

The police soon discovered the murder site, near the shore where Mary's body was found. The site contained blood stains, a jaw bone, teeth, and drag marks leading toward the water. In the drag marks between the murder site and the edge of the water, the police found a corncob pipe with a broken stem. In an interview with the police, Petitioner said that, when he, Greg, and Mary had smoked along the side of the road in the middle of the night, they had used his corncob pipe with a broken stem. Petitioner reported that he no longer had the pipe and that he either lost it when he was with Greg and Mary or left it behind with them.

The police arrested Petitioner on August 26, 1985, and executed a search warrant on his car. They found a gun-cleaning kit, Petitioner's empty rifle case, a paper bag containing approximately 20 expended rifle shell casings, a plastic bag with more expended shell casings, a tupperware container holding matches, a second tupperware container with fish hooks, and some clothing.

At trial, in addition to establishing the chronology described above, the prosecution offered other circumstantial evidence implicating Petitioner in the murders. For example, Petitioner's high-powered rifle was capable of producing the wounds found on the victims. Moreover, Petitioner's rifle had some peculiarities such that, if operated by a person unfamiliar with the rifle, the loading mechanism might jam. The prosecution suggested that, accordingly, it was implausible that someone stole Petitioner's rifle and committed the murders with it. As another example, some witnesses testified that Petitioner liked to play a game that he called "stalk," in which he would sneak up on unsuspecting persons without their knowledge.

The prosecution also pointed out inconsistencies and other oddities in Petitioner's statements to the police after the murders. For example, during one interview, Petitioner estimated that he arrived at the laundromat, to wash his clothes, the morning of the murders at approximately 6:00 a.m. When the police detective asked him what time the laundromat opened, Petitioner replied that it did not open until 7:00 a.m., so he actually must not have arrived until 7:00 a.m. Also, the witness who saw Petitioner walking in Berkeley in the morning testified that Petitioner was not carrying anything, including not carrying any clothes.

According to a police detective, Petitioner originally said that Greg was at the party in Rainbow Village but later told him that Greg was not present. Additionally, sometimes Petitioner stated that Greg and Mary asked for a match and at other times he stated that they asked for marijuana, too. The prosecution also presented evidence that a book of matches was found in Mary's clothing, suggesting that the victims would not have needed to ask Petitioner for matches.

Finally, a police detective told Petitioner that the police could not figure out a motive. Petitioner responded that he could think of plenty of reasons why someone would want to murder Greg and Mary. When pressed, Petitioner paused and then said that he could not think of any motive at that time. The detective asked Petitioner if he would be willing to take a lie detector test about the missing rifle. Petitioner replied that he would have to think about it and get some legal advice.[3]

## 2. *The Defense*

The defense strategy was twofold. First, the defense argued that the prosecution had not met its high burden of proving the case. The defense emphasized the circumstantial nature of

---

[3]The record does not disclose whether Petitioner ever took a lie detector test.

the evidence against Petitioner, pointed out weaknesses in that evidence, and reminded the jury of the government's high burden of proof.

The prosecution had not established motive or produced a murder weapon. There were no witnesses to the crimes. No blood stains were found on Petitioner's clothing. Petitioner had no visible scars, bruises, or other marks that might be expected after a struggle.

The defense presented evidence that, although Greg had been wearing shoes and a colorful serape the night before he was murdered and although the police had searched Petitioner's possessions for those items, the police never found Greg's shoes or serape.

In response to the prosecution's argument that Petitioner's long walks were implausible, the defense presented evidence that Petitioner had more than enough time to complete his long journeys throughout the early morning. Although Petitioner asked Medlin to store his gun-cleaning kit and a tupperware container, Petitioner was far from alone in this regard: In the wake of the murders, several other residents similarly had asked Medlin to store incriminating items, for fear that the police soon would search Rainbow Village. Similarly, the defense suggested that Petitioner may have identified Mary's body—by stating "[t]hat's Mary"—when he was much closer to the body than the police detective suggested. Moreover, it is plausible that a person who partied with the victim the night before would be able to identify her body from a small number of visual clues, including the clothing that all agree was visible.

Most fundamentally, however, none of the evidence presented by the prosecution plainly contradicted Petitioner's generally consistent account of what had occurred on the night of the murders and during the following morning. Petitioner had partied with the victims and others; he had smoked

marijuana with the victims by the side of the road; he had reported his rifle stolen; and he had reported his corncob pipe missing and guessed that he had left it with the victims. If credited, Petitioner's account provided an innocent explanation for the vast majority (if not all) of the circumstantial evidence presented by the prosecution.

The defense's second strategy was to present evidence that another person, and not Petitioner, had committed the crimes. In this regard, the defense offered as evidence the testimony of Vivian Cercy (and, as discussed in more detail below, *only* the testimony of Vivian Cercy).

Vivian was a homeless woman who traveled throughout the United States, typically by car or bus. Vivian testified at the grand jury hearing but, by the time of the trial, she had left the Bay area. Defense counsel tried, unsuccessfully, to locate her and bring her back to Berkeley for trial. The trial court held that she was unavailable and, under California law, permitted the defense to read her grand jury testimony to the jury.

At the time of the murders, Vivian was the girlfriend of Rainbow Village resident Harry Shorman. Vivian had been staying in or near Rainbow Village for, at most, five days. She disliked staying in Rainbow Village, because she did not think that it was safe for her or her two young daughters.

On the night of the murders, she decided to park her car outside the official confines of Rainbow Village, at a location "down the road" from the Village. When she thought that everyone had gone to sleep in the Village, at approximately 1:30 a.m., she drove to a dumpster located just outside the Village. She saw Petitioner come to the gate and then walk back into the Village.

Vivian got out of her car to dump some trash, when she saw a woman and two white men—one brown-haired and one blond-haired—standing near the dumpster. (Everyone agrees

that neither of the men was Petitioner, in part because Petitioner is black.) During her testimony, Vivian viewed photographs and identified the woman as Mary and the brown-haired man as Greg.[4] She described the blond-haired man as a tall, thin blond man, whom she referred to as "Bo."[5] Vivian noticed that the blond man was holding a long, stick-like object in his hand; the object could have been a rifle.

Vivian overheard the three people talking. The blond man asked, "do you think she's seen anything?" The brown-haired man replied, "no, she couldn't have." Either the blond man or the brown-haired man placed the object against the side of a car. The woman said to the blond man, "you have to give it back." He replied, "this could mean money to us, we need this." The woman responded, "I don't want any part of this. I'm going."

The woman began to walk down the hill, past Vivian's car. Vivian told the woman, "you don't have to take this shit from nobody," and invited the woman to stay in her car. The woman responded, "no, I'll be alright." The woman continued to walk down the road. The blond man told the brown-haired man, "I'll take care of this." The blond man walked down the road, away from the Village, following the woman. Vivian asked him for his name as he passed, but he did not reply.

Vivian returned to her original parking spot, down the hill, and prepared herself and her children for sleep. About 15 minutes later, she heard three noises that sounded like firecrackers. About 90 minutes after hearing the noises, Vivian

[4]The identifications were somewhat equivocal. Shown a photograph of Mary, Vivian testified that "[t]his could be her[ ]." Shown a photograph of Greg, Vivian testified that it "looks similar" to the man.

[5]The jury never learned that, in fact, a tall, thin blond man named James Bowen, familiarly known as "Bo," was present in Rainbow Village on the night of the murders. See the discussion below concerning defense counsel's constitutionally insufficient investigation.

saw a blond man walk up from the waterfront, wiping his hands in the vegetation and the dirt. He had a backpack, and he either took something out of it or put something into it. Vivian was uncertain whether it was the same blond man whom she had seen earlier: "It was similar to the same man. I can't, you know, [I] wasn't real close to him like I was the first time."

Vivian decided to move her car again, in part because she was "getting kind of afraid." She drove back up the hill, to just outside the gates of Rainbow Village, thinking that she would join Harry in his bus. When she got there, she saw a blond man, again similar to the other blond man she saw earlier. The blond man was washing his hands and hair at the sink outside the gates. He was not wearing a shirt and appeared to be washing a shirt in the sink, too.

Vivian then decided to return to her original parking spot once again because: "I didn't want to invade on anybody's privacy if they were cleaning up in the sink, you know. Like I said I was still unaware of the general nature of Rainbow Village, the routine." A little later, at approximately 4:00 a.m., a man wearing a long coat knocked on her car window and asked for her name and for the location where she was staying. Vivian testified that she could not recall what the man looked like. Vivian told the man her name and said that she was "staying up at the Village at Harry's." The man asked her about Harry and his vehicle, and Vivian asked the man why he was asking "all these questions." The man replied, "because I'm going to kill you." Vivian froze, and the man walked away. Vivian remained where she was for another hour or so; when it started to get light out, she drove into Berkeley.

### 3. *Rebuttal*

In rebuttal, the prosecution recalled to the stand Rainbow Village resident Vincent Johnson, who earlier testified that he

saw Petitioner smoking with the victims. Vincent testified that, a month or two after the murders, Vivian told him that she actually had not seen anything on the night of the murders and that "everything she said, she said because Harry told her to say it."

### 4. *Closing Arguments, Jury Verdict, and Direct Appeal*

In its closing arguments, the prosecution emphasized the strength of the circumstantial evidence against Petitioner and repeatedly encouraged the jury to find Vivian Cercy's story a complete fabrication. The prosecution asked the jury: "Is she being truthful . . . ?" According to the prosecution, Vivian's "story" "makes no sense[ ] at all[;] [n]o sense at all." "She had no knowledge of what went on that night." The prosecution described Vivian's testimony as a "little charade," "truly amazing," "really amazing," "fantastic, absolutely fantastic," "ludicrous . . . ludicrous." The prosecution rhetorically addressed Vivian: "Come on, Vivian. Come on, Vivian. It is a good thing you're out of town, you would probably be charged with perjury." And the last thing that the prosecution stated before asking the jury to find Petitioner guilty beyond a reasonable doubt was that "[t]he defense has been contrived. The testimony of Vivian Cercy is ridiculous, at best, perjurious at worst."

The jury deliberated for nearly five days and returned a guilty verdict. After a penalty-phase hearing, the jury sentenced Petitioner to death. On direct appeal, the California Supreme Court affirmed. *People v. Thomas*, 828 P.2d 101 (Cal. 1992).

### B. *Habeas Proceedings*

On April 15, 1996, Petitioner filed a federal habeas petition. The petition included both exhausted and unexhausted claims. In 1997, the district court granted Petitioner leave to amend the petition to delete unexhausted claims, and the dis-

trict court ordered Petitioner to file a second amended petition upon completion of state-court proceedings.

Petitioner then filed a state habeas petition in the California Supreme Court.[6] Petitioner alleged that his trial counsel, James Chaffee, had provided ineffective assistance of counsel by failing to investigate and locate potential witnesses who could corroborate Vivian Cercy's testimony and support the theory of third-party culpability. The California Supreme Court appointed a referee to conduct an evidentiary hearing on Petitioner's claim and to make factual findings.[7]

### 1. *Evidentiary Hearing*

At the evidentiary hearing, Petitioner put forth evidence that, had his trial counsel adequately investigated Vivian's story, he would have found eleven additional relevant witnesses. The testimony of those witnesses described the following events that, according to Petitioner, would have corroborated Vivian's version of events and implicated "Bo" in the murders.

On the night of the murders, a tall, thin blond man generally known as "Bo," whose real name was James Bowen, was staying in Rainbow Village. Bo was a Deadhead and, like the victims, was staying on the Dead On bus. Bo owned a silver Volkswagen and had it with him in Rainbow Village. Bo was well known among the Deadheads, in part because he sold clothing, primarily tie-dyed shirts, at Grateful Dead shows.

---

[6]Petitioner earlier had filed two other habeas petitions, which the California Supreme Court denied. Those decisions are not at issue here.

[7]The California Supreme Court directed findings concerning two general topics: whether Chaffee had conducted an adequate investigation and whether any deficiency in the investigation prejudiced Petitioner at trial. Because, as discussed below, the California Supreme Court found that Chaffee conducted a constitutionally insufficient investigation, and because Respondent does not challenge that finding here, we focus on the evidence relevant to the prejudice determination.

Before the murders, Bo regularly attended Grateful Dead shows and sold his merchandise.

A friend of Bo's, a white man named Weston Sudduth, also was a Deadhead and was staying in Rainbow Village on the Dead On bus. Weston commonly wore a long trench coat or pea coat. Bo and Weston were seen together the day before the murders.

Bo had a sexual relationship with Mary. A night or two before the murders, one witness testified, Bo had argued with Mary and sounded controlling toward her. Mary seemed upset and afraid. One witness testified that she had witnessed both Bo and Weston being verbally or physically abusive to women in the past.

On the night of the murders, one witness saw a white man, wearing a long trench coat or a pea coat, walk over to Vivian's car and talk to Vivian. The witness was too far away to hear what was said.

On the day after the murders, several witnesses testified that Bo seemed nervous, panicky, or anxious and in a hurry to leave Rainbow Village. Some of those witnesses observed Bo's anxious behavior before Mary's body had been found. Bo also exhibited strange behavior during three separate incidents on the day after the murders. First, before Mary's body was found, one witness overheard Bo tell Weston, as they stood at the community sink, that "sometimes a man's got to do what a man's got to do."

Second, at some point after Mary's body had been found, one witness was alone in the Dead On bus with Bo and Weston. When the witness asked them what they had done the previous night, Bo responded that "we went swimming into the bay last night."[8] The witness testified that Weston "sud-

---

[8]The witness was unsure whether Bo said that "I" went swimming into the Bay or whether Bo said that "we" went swimming into the Bay.

denly jabbed" Bo with his elbow and "gave him a look like don't say anything more." The conversation quickly ended, and Bo and Weston left the bus.

The third incident involved Claus von Wendel. Von Wendel lived on a boat a short distance from Rainbow Village. The morning after the murder, von Wendel awoke early and noticed a bag sitting on the veranda part of his boat. He picked it up but then put it back down, thinking that its owner would return to collect it. When von Wendel learned that a body had been found in the Bay, he became suspicious about the bag and opened it. The bag contained some books, a driver's license registered to a man with the name of "Bryan" or "Bryant," a pair of shoes, and a serape.[9] Petitioner suggests that the shoes and serape could have been Greg's shoes and serape, which the police never found.

Later that day, a blond man came to claim the bag. At the evidentiary hearing, von Wendel identified a picture of James Bowen, or Bo, as the same person who came to claim the bag. Von Wendel told the blond man that he did not have permission to leave his belongings on von Wendel's boat. When Bo told von Wendel that he had slept on the veranda of von Wendel's boat, von Wendel became angry. Bo, who seemed like he was in a hurry to leave, got in his Volkswagen and left hastily. Another person was seated in the car throughout the exchange, and that person left in the car with Bo.

A few days after the murders, a local Berkeley resident who had been in the process of making a documentary about Rainbow Village decided to visit the Village to conduct interviews about the murders. In one video, taken two or three

---

[9]At the evidentiary hearing, von Wendel stated that he observed a "blanket type material" in the bag. In a later declaration and deposition, von Wendel clarified that what he had seen was "a Mexican looking serape or blanket" and "Mexican type clothing . . . [l]ike the woven cotton or wool. What's the word? Like a serape."

days after the murders, Vivian Cercy recounted on videotape what she had seen.[10] Her description largely accorded with her testimony read at Petitioner's trial.

After the murders, Bo moved to Chico, California. Although Bo had been a regular attendee of Grateful Dead shows before the murders, he no longer was seen at the concerts, except on rare occasions. When he did attend, he appeared to be avoiding those who had been at Rainbow Village at the time of the murders.

One of Bo's friends while Bo was living in Chico described a strange incident. The witness had been lamenting to Bo about a broken heart. Bo stated, without elaboration, that he had "killed his brother over a woman." At the time, the witness had not heard about the murders in Rainbow Village. He thought that Bo's comment was bizarre, but he did not ask Bo further questions.

Bo lived with a group of Deadheads in Chico for several months. Weston, too, lived in Chico and occasionally visited the apartment where Bo lived. Two of Bo's apartment mates testified about an odd sequence of events potentially relevant to Petitioner's case. One day, Weston came over to the apartment and found Bo sitting on the couch. Weston started talking to Bo and using hand gestures in a confrontational manner. Weston stated to Bo: "How can you sleep at night? How can you live with yourself?" (or, according to another witness, "how could you do it? How can you sleep with yourself at night?"). Bo's demeanor was sheepish and passive. Weston then asked Bo, "why were you washing your hands in the early morning at the bathrooms?" Weston then left.

Bo became severely withdrawn. He locked himself in his room for the next few weeks, talked very little to others, and

---

[10]Because Vivian was afraid, she refused to appear on camera. Instead, she told her story from inside a vehicle, out of the camera's view.

went out only at night. A few weeks after the Weston confrontation, Bo surprised his apartment mates and joined them and others on a hike. Bo became separated from the group and then reappeared. Bo was in "a complete rage." He was crying, very upset, and frantic. He accused his companions of abandoning him. The group soon returned to the apartment. In the middle of the night immediately following the hike, Bo secretly packed up all of his belongings and left the apartment without a word to the others.

The state-court referee issued a 57-page report. The referee held that Chaffee had conducted an adequate investigation. The referee also found that Chaffee could have located only three of the eleven relevant witnesses: Claus von Wendel, Randy Turley, and Jong Cheol Cho. The referee found that Chaffee reasonably declined to call von Wendel as a witness and that Chaffee "could not reasonably have learned" that Turley and Cho "had any useful information as a potential witness."

### 2.   *California Supreme Court's Opinion*

The California Supreme Court adopted only some of the referee's findings. *In re Thomas*, 129 P.3d 49 (Cal. 2006). With respect to Chaffee's investigation, the court held, in part:

> As the referee found, and the parties do not dispute, Chaffee conducted no investigation for supporting witnesses or corroborating evidence outside Rainbow Village, despite knowing or having strong reason to suspect that both the victims and Bo came not from Rainbow Village but from the distinct Deadhead community. We conclude this omission was unreasonable. Chaffee's apparent strategy was twofold: he wanted to cast doubt on the prosecution's circumstantial evidence, including the apparent lack of motive, and he wanted to offer the jury

the possibility of an alternate killer. Given this strategy, any evidence adding to the plausibility of the alternate-killer theory would have been critical. Did Bo exist? Did he have ties to the victims? What was the subject of the argument Cercy reported witnessing between Bo and [Mary] Gioia? Did Bo own or have access to a gun? Given the actual defense strategy, these were crucial questions. Given the knowledge that [Mary] Gioia and [Greg] Kniffin were Deadheads who had come to Berkeley for a show, and reason to suspect that Bo (if he existed) was likewise a member of this transient Deadhead community, a reasonable attorney would have made *some* effort to trace Bo in that community.

. . . [Chaffee] never asked an investigator to conduct any search in the Grateful Dead community, nor did he ask anyone more familiar with that community how he might go about tracking down a Deadhead. A reasonable attorney in 1985, charged with representing a capital defendant, would have pursued what leads Chaffee had in the Grateful Dead community, the community from which the victims and Bo came.

. . . .

We conclude that Chaffee failed to conduct a reasonable investigation for evidence to corroborate Vivian Cercy's testimony and support the theory that someone other than Thomas was the actual killer. His decision to proceed with Cercy's testimony alone was a consequence of this unreasonably limited investigation and thus was not a justifiable tactical decision. Consequently, Thomas has demonstrated that his counsel's performance was deficient.

*Id.* at 57-59.

With respect to prejudice, the California Supreme Court adopted the referee's finding that Chaffee reasonably could not have found eight of the eleven potential witnesses. *Id.* at 62. With respect to von Wendel, the court held that Chaffee reasonably declined to call him as a witness due to a "tactical justification." *Id.* at 63. With respect to the final two witnesses, Turley and Cho, the California Supreme Court adopted the referee's factual findings related to the witnesses' prospective testimony, *id.*, but held that there was no reasonable probability that their testimony would have affected the jury's verdict, *id.* at 66.

The court held that, "though circumstantial, the evidence against Thomas was considerable." *Id.* The court held that the "evidence fell into four categories: (1) Thomas's ownership of a high-powered rifle that could have been the murder weapon; (2) sightings of him with the victims shortly before their deaths; (3) incriminating statements and actions by Thomas in the days following the murders; and (4) certain additional physical evidence," most notably the corncob pipe found along the drag marks leading to the water. *Id.* at 63. In light of this "considerable" evidence, the court concluded:

> The real difficulty with the potential case against "Bo," however, is that it does absolutely nothing to undermine the case actually presented against Thomas—the fortuitous "disappearance" of his .44 magnum rifle, the multiple witnesses who saw him with the victims, his identification of [Mary] Gioia the next morning, the repeated inconsistencies in his shifting explanations, and the corncob pipe found at the scene. Put another way, even if listening to the habeas corpus witnesses might in the abstract make one ponder a small possibility that "Bo" *might have* killed [Mary] Gioia and [Greg] Kniffin, listening to the prosecution case would have established in a rea-

sonable juror's mind the near certainty that Thomas *did* kill them. We thus conclude that Thomas has not demonstrated a reasonable probability of a more favorable outcome.

*Id.* at 66.

Justice Kennard dissented. In her view, a reasonable lawyer would have located more than just the three witnesses described by the majority. *Id.* at 70 (Kennard, J., dissenting). On the issue of prejudice, Justice Kennard stated:

> The witnesses who testified at the evidentiary hearing would have greatly strengthened witness Cercy's preliminary hearing testimony had they testified at petitioner's trial. They would have established that "Bo" was a real person, not a figment of Cercy's imagination; that Bo was in Rainbow Village on the night of the two murders; and that Bo had an unpleasant talk with murder victim [Mary] Gioia shortly before her death. And had those witnesses been called at trial, their testimony would have shown that several months after the two murders, Bo admitted killing his "brother" over a woman. The word "brother" in this context could have been a reference to a close companion rather than a sibling, and Bo's statement might have been considered by the jury as an admission of guilt.

> Most significant, however, was the testimony of Jong Cheol Cho. He testified that, *during a conversation about the murders the day after they occurred*, Bo said he had gone swimming in San Francisco Bay the previous night, and that Bo then suddenly stopped talking after his friend Weston elbowed him in the ribs. Unless Bo had some innocent reason to go swimming in San Francisco Bay at night (and the majority offers none) and an innocent

reason to mention this late-night swim during a conversation about the murders (and the majority offers none), Bo's statement strongly implicates him in the murders of [Mary] Gioia and [Greg] Kniffin, whose killer or killers had dumped their bodies in the bay.

When a criminal defendant at trial has been denied the constitutional right to effective representation, reversal is required if there is a "reasonable probability"—that is, a probability "sufficient to undermine confidence in the outcome"—that counsel's incompetence affected the jury's verdict. (*Strickland v. Washington*, [466 U.S. 668, 694 (1984)].) Here, if the jury had heard the testimony of the witnesses that petitioner presented at the evidentiary hearing, it might nonetheless have convicted him of the two murders and imposed the death sentence. But there is at least a reasonable probability that it would not have done so. Notwithstanding the minimal showing by the defense in support of its claim that Bo rather than [petitioner] committed the murders, the jury deliberated for five days before rendering its verdicts. These lengthy deliberations are a strong indication that the jury found the issue of [petitioner]'s guilt to be close and difficult. Had [petitioner]'s trial attorney called the witnesses who later testified at the evidentiary hearing, his claim that James Bowen rather than petitioner committed the murders would have been greatly strengthened, and the jury might well have concluded there was a reasonable doubt about [petitioner]'s guilt and declined to convict him of the capital murders.

*Id.*

### 3.  *District Court's Opinion*

Petitioner then filed, in federal court, a second amended habeas petition, which included the now-exhausted claim of

ineffective assistance of counsel. In the federal proceedings, Respondent does not dispute that Chaffee's representation was deficient. The only issue before the district court, therefore, was whether the concededly deficient performance prejudiced Petitioner.

In a written order, the district court concluded that Petitioner had demonstrated prejudice. The district court held that the California Supreme Court's finding that a competent investigation would have discovered only three of the eleven witnesses was not fairly supported by the record. The district court held that a competent investigation would have discovered all eleven of the witnesses proffered by Petitioner.

On the issue of prejudice, the district court reasoned, in relevant part:

> At the outset, the evidence against petitioner was entirely circumstantial and not substantial. As noted *supra*, it included 1) petitioner's ownership of a rifle that could have inflicted the victims' wounds, 2) sightings of Thomas alone with the victims shortly before the killings, 3) petitioner's conduct and statements before and after the murders, and 4) a corncob pipe recovered at the murder scene that was argued to belong to petitioner. There were no eyewitnesses to the crime, no confession, no murder weapon was found, and there was no blood or DNA tying petitioner to the crime. Courts have found cases where no physical evidence links the accused to the crime to be close ones.

> Moreover, each item of evidence lends itself to an explanation that is not inculpatory. Petitioner's rifle, which was never clearly established as the murder weapon, could well have been stolen, just as he consistently told people. The fact that petitioner was seen with the victims the night of the murders does

not establish that he killed them, particularly given that Bo was reportedly seen with the victims later under more suspicious circumstances. That petitioner's corncob pipe was found near the crime scene can be explained by the fact that petitioner and the victims had been smoking marijuana from that pipe, and the plausible possibility that he did not retrieve it from them. Petitioner's statement, "That's Mary," identifying [Mary] Gioia's body when he was 45 feet away loses its significance when considered in light of the fact that he had already seen the body from a closer distance before he made the remark to the police officer, as well as [Mary] Gioia's distinctive and eccentric manner of dress, which would have been recognizable to petitioner given that he had spent the previous evening in her company. Finally, petitioner's "inconsistent statements," which mostly pertained to his wanderings the night of the murder, are not so numerous, inexplicable or dramatically inconsistent as to suggest a fabricated story. For example, one of the inconsistencies cited by the state court was that petitioner initially stated that [Greg] Kniffin had not been partying with petitioner and others the night before the murders, but later said that he was in fact with them. As the trial evidence established, [Greg] Kniffin was not part of the party when it started, but was picked up by the group later, after they gave another partygoer a ride to Richmond. Furthermore, although petitioner's story about trekking around Berkeley on the night of the murders may have been strange, he was perhaps a strange person, but not necessarily a murderer. Petitioner told Detective Eihl that on the night before the murders, he partied with [Mary] Gioia and others in a van. He stated that he later ran into [Mary] Gioia and [Greg] Kniffin on a road leading from Rainbow Village to a liquor store, smoked marijuana with them,

proceeded to go to the liquor store, found it closed, came back to Rainbow Village, got money and went to various locations to try and buy marijuana. When it grew light, he went to a laundromat to do laundry and then returned to Rainbow Village. While these activities may be odd, they are not necessarily suggestive of guilt.

Although the sum of circumstantial evidence presented against petitioner was perhaps sufficient to justify his conviction, it does not follow that his trial would have yielded the same result had a competent investigation been completed. Indeed, had Cho, Von Wendel and Turley, all three of whom the state court conceded would have been found through a competent investigation, testified at trial, there is a reasonable probability that the outcome of trial would have been different.

Cho would have testified that there actually was a man named "Bo" in the Deadhead community who matched Vivian Cercy's description, and that he was in Rainbow Village on the night of the murders. Turley would have corroborated Bo's existence and description. This would have established that Cercy was not fabricating her story. More importantly, Cho would have informed the jury that the morning after the murders, he had a conversation with Bo and Bo's friend Weston Sudduth, during which Bo said that "I" or "we" ["]went swimming in the Bay last night," prompting Sudduth to jab him and give him a look and thus ending the conversation. At this point, the jury would have had a plausible alternate scenario about the murders that did not inculpate petitioner. Testimony such as this, that corroborates an otherwise bare defense, "would have created more equilibrium in the evidence presented to the

jury." *Riley v. Payne*, 352 F.3d 1313, 1320-21 (9th Cir. 2003).

> The jury would have also heard from Von Wendel. Von Wendel would have testified about his confrontation with Bo, who had suspiciously left a bag on Von Wendel's boat some time during the night of the murders—a bag whose contents corresponded to the shoes and poncho that were missing from [Greg] Kniffin's body when it was found. When combined with Cho's testimony about Bo swimming in the Bay, Von Wendel's testimony would have bolstered Cercy's account, and would have led the jury to harbor a reasonable doubt as to whether Bo, rather than petitioner, committed the murders.

> . . . .

> The Court concludes that had trial counsel conducted a competent investigation, confirmed Bo's existence and presented corroborating evidence of Cercy's testimony, there is a reasonable probability that as least some jurors would have harbored reasonable doubt with respect to petitioner's guilt. His failure to do so undermines confidence in the outcome of his trial.

(Most citations omitted.)

The district court granted a writ of habeas corpus to Petitioner on the claim of ineffective assistance of counsel. The court dismissed as moot, and without prejudice, Petitioner's remaining claims. Respondent timely appeals. The district court granted Respondent's motion for a stay pending appeal.

## STANDARDS OF REVIEW

We review de novo the district court's grant of habeas relief. *McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008).

**[1]** The more stringent requirements imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") do not apply to this case because Petitioner filed his habeas petition before the effective date of the Act. Respondent argues that AEDPA applies because, even though Petitioner filed a habeas petition before the effective date of AEDPA, he filed an amended habeas petition after the effective date of AEDPA.[11] We disagree.

**[2]** We have consistently held that where, as here, a petitioner filed a habeas application before the effective date of AEDPA and the district court retained jurisdiction over the case, AEDPA does not apply even if the petitioner files an amended petition after the effective date of AEDPA. *See, e.g.*, *Sivak v. Hardison*, 658 F.3d 898, 905 (9th Cir. 2011) (holding that "[o]ur review is governed by pre-AEDPA standards . . . even though Sivak filed amended petitions after AEDPA was enacted"); *Allen v. Roe*, 305 F.3d 1046, 1049 & n.1 (9th Cir. 2002) (holding that, "[b]ecause Allen filed his § 2254 petition prior to the effective date of [AEDPA], review of his petition is governed by pre-AEDPA law" and holding, in a footnote, that "[b]ecause the district court retained jurisdiction over Allen's original 1993 petition, it is not problematic that the amended petition was filed after the effective date of the AEDPA"); *accord Robinson v. Schriro*, 595 F.3d 1086, 1098-99 (9th Cir.), *cert. denied*, 131 S. Ct. 566 (2010); *Mancuso v. Olivarez*, 292 F.3d 939, 948-49 (9th Cir. 2002); *see also Stankewitz v. Woodford*, 365 F.3d 706, 713 (9th Cir. 2004) (assuming, without deciding, that pre-AEDPA standards apply in similar circumstances).

---

[11]Respondent did not make this argument before the district court. Respondent urges us to excuse that failure because, in his view, the correct standard of review in this context cannot be waived. Several of our sister circuits have so held. *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009); *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003). We need not decide whether Respondent waived the AEDPA argument because, as explained in text, we hold that the argument fails on its merits.

As the Supreme Court has explained, the relevant portions of AEDPA apply "only to such *cases* as were filed after the statute's enactment." *Lindh v. Murphy*, 521 U.S. 320, 326 (1997) (emphasis added); *see also id.* at 336 (holding that the relevant portions of AEDPA "apply only to *cases* filed after the Act became effective" (emphasis added)). In *Woodford v. Garceau*, 538 U.S. 202, 204 (2003), the Supreme Court summarized *Lindh* as having held that the relevant parts of AEDPA "do not apply to cases pending in federal court on . . . AEDPA's effective date," and the Court "consider[ed] when a capital habeas case becomes 'pending' for purposes of the rule announced in *Lindh*." The Court concluded *that "a habeas suit begins with the filing of an application for habeas corpus relief." Id.* at 208. Because Petitioner here filed his application for habeas corpus relief before the effective date of AEDPA, pre-AEDPA law applies. *See Smith v. Mahoney*, 611 F.3d 978, 994-95 (9th Cir.) (holding that, for those same reasons in similar circumstances, AEDPA's statute of limitations did not apply and concluding that, "[f]or the foregoing reasons, we evaluate the merits of Smith's claims under pre-AEDPA standards"), *cert. denied*, 131 S. Ct. 461 (2010).

Under pre-AEDPA law, "[w]e review de novo questions of law and mixed questions of law and fact, whether decided by the district court or the state courts." *Sivak*, 658 F.3d at 905 (internal quotation marks omitted). "[W]e do not review the state court's legal conclusions to determine whether they are objectively unreasonable; rather, we simply resolve the legal issue on the merits, under the ordinary rules." *Smith*, 611 F.3d at 986 (internal quotation marks omitted).

"State court factual findings are entitled to a presumption of correctness, subject to eight exceptions enumerated in the previous version of 28 U.S.C. § 2254(d)." *Sivak*, 658 F.3d at 905-06 (internal quotation marks omitted). Applicable here, state-court factual findings are not entitled to a presumption of correctness if they are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994); *see also Jackson v. Brown*,

513 F.3d 1057, 1069 & n.6 (9th Cir. 2008) (stating the rule and listing the eight exceptions).

## DISCUSSION

We review claims of ineffective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, Petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The California Supreme Court held that Petitioner met the first prong of the *Strickland* test because his trial counsel conducted a constitutionally inadequate investigation of Vivian Cercy's account suggesting that James Bowen had committed the murders. Respondent did not challenge that conclusion before the district court, and he does not challenge it before us. In this unusual case, then, the *only* issue is whether there is a "reasonable probability" that the jury would have reached a different verdict had Petitioner's trial counsel conducted an adequate investigation. "To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Karis v. Calderon*, 283 F.3d 1117, 1133 (9th Cir. 2002).

### A. *Case as Presented*

Although the prosecution had no direct evidence that Petitioner committed the murders, it presented circumstantial evidence that cast considerable suspicion upon Petitioner. We recounted that evidence in considerable detail, above, in the

Factual and Procedural History. The California Supreme Court also has detailed the evidence, both on direct appeal, *Thomas*, 828 P.2d at 106-12, and on habeas review, *In re Thomas*, 129 P.3d at 63-66. For present purposes, we briefly describe the evidence admitted at trial. We find useful the California Supreme Court's grouping of the evidence into four categories: (1) Petitioner's rifle; (2) his presence with the victims before their deaths; (3) his incriminating statements and actions after the murders; and (4) additional physical evidence. *In re Thomas*, 129 P.3d at 63.

(1) Petitioner possessed a rifle that could have been the murder weapon. Petitioner fired the rifle the night before the murders, but the rifle had disappeared by the next morning. Petitioner reported the rifle missing, but it was never found. The rifle had some peculiarities such that, if a person unfamiliar with the rifle used it, it might jam.

(2) Petitioner was seen with the victims shortly before the likely time of murder. Petitioner appeared angry.

(3) On the morning after the murders, Petitioner identified the body floating in the water as Mary, even though he was 45 feet away and had few visual clues. Though his account shifted in some details, Petitioner told the police that he had embarked on a series of long walking journeys, totaling 16.8 miles, during the hours when the victims were murdered. Petitioner asked Thomas Medlin to conceal his gun-cleaning kit and a tupperware container that may have contained ammunition for the rifle. During interviews with a police detective, Petitioner made some curious statements. For instance, he changed his estimate of the time that he arrived at the laundromat after being confronted with the laundromat's hours of operation. He also asserted that he could think of many motives for killing the victims but declined to offer one when asked. He told the detective that he would have to get legal advice about whether to take a lie detector test.

(4) Finally, the police found a corncob pipe with a broken stem, in the drag marks between the murder site and the edge of the water. Petitioner admitted that he owned a corncob pipe with a broken stem. Petitioner told the police that his pipe was missing.

[3] The prosecution's evidence certainly goes a long way toward implicating Petitioner. Petitioner was present; was the last person seen with the victims by those who testified at trial, at a location near the murder site; had access to what could have been the murder weapon; told a bizarre, mostly uncorroborated tale of where he had been; identified Mary's body in a potentially suspicious manner; gave the police and acquaintances somewhat conflicting descriptions of his activities on the night of the murders; acted oddly after the murders; and owned a distinctive pipe that was found between the murder site and the Bay. The defense offered innocuous explanations for most of that evidence and presented a strange and wholly uncorroborated theory of third-party culpability, through Vivian Cercy's testimony. But the basic facts implicating Petitioner, just described, remain essentially undisputed.

[4] Nevertheless, in our view, the case against Petitioner was not overwhelmingly strong. The prosecution presented circumstantial evidence only: *no* motive, *no* murder weapon, *no* witness to the crime, *no* fingerprint evidence, and *no* blood or other bodily fluid evidence. Additionally, the defense offered an alternative version of the murders that incriminated a tall, thin, blond white man, "Bo."

[5] In fact, the objective clues as to the jury's assessment of the case strongly suggest that the case was close. The jury deliberated for almost five full days, even though it heard argument and evidence for only about six days. "[L]engthy deliberations suggest a difficult case." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (internal quotation marks omitted); *see Daniels v.*

*Woodford*, 428 F.3d 1181, 1209-10 (9th Cir. 2005) (holding that the fact that "[t]he jury deliberated for two days before returning a verdict . . . suggests that the jury may have been influenced by [additional] evidence had it been offered" and concluding that "[t]his alone is sufficient for a finding of prejudice"); *Dyas v. Poole*, 317 F.3d 934, 936-37 (9th Cir. 2003) (per curiam) (holding that "the evidence against Dyas was not overwhelming, a fact reflected in the length of the jury's deliberations," where "the jury took 3-1/2 days to deliberate following Dyas's 5-day trial"). As the District of Columbia Circuit stated long ago, "[t]he jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner." *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969). The jury also requested several readbacks of testimony on three separate occasions, which is an indication that "[t]he jury was clearly struggling to reach a verdict." *Gantt v. Roe*, 389 F.3d 908, 916 (9th Cir. 2004); *see also Merolillo v. Yates*, 663 F.3d 444, 457 (9th Cir. 2011) (holding that a request for a readback of testimony "illustrates the difficulty presented by" the case); *Merolillo*, 663 F.3d at 457 ("'[T]he jury asked for readbacks of [witnesses'] testimony while it was deliberating, so it evidently did not regard the case as an easy one.'" (second alteration in original) (quoting *United States v. Blueford*, 312 F.3d 962, 976 (9th Cir. 2002))).

We also know that, even with the deficient performance by trial counsel, the jury struggled with precisely the theory that adequate representation would have bolstered. As the California Supreme Court stated, "aside from casting doubt on the prosecution's evidence, trying to offer a credible alternative killer was the *main defense*." *In re Thomas*, 129 P.3d at 58 n.4 (emphasis added). Two of the requested readbacks related directly to that main defense: The jury requested "the reading of Vivian [Cercy]'s testimony" on the first day of deliberations, and on the third day of deliberations the jury asked that the court reporter "read testimony limited to positive statements that the Grateful Dead were in town on August 15 and

August 16 and fans/grouppies [sic] possibly in area of Rainbow Village."

**[6]** In sum, the case was close, and a reasonable jury would have struggled with the question whether the theory of the alternative credible killer—the tall, thin, blond "Bo"—created a reasonable doubt as to Petitioner's guilt. In fact, it seems clear that the jury actually struggled with that question, because of the length of deliberations and the two requests for readbacks related specifically to that question.

B.   *Case Including Additional Witnesses*

At the evidentiary hearing, Petitioner put forth evidence that Chaffee should have located eleven relevant witnesses. The California Supreme Court found that, had Chaffee conducted an adequate investigation, he would have found only three of the eleven witnesses: Randy Turley, Jong Cheol Cho, and Claus von Wendel. For purposes of our analysis, we accept the California Supreme Court's finding in that regard.[12]

The California Supreme Court considered the full testimony of Turley and Cho, so there is no impediment to our doing so.[13] The California Supreme Court declined to consider von Wendel's testimony, however, because the court held that Chaffee had a "tactical justification" for failing to call von Wendel as a witness. Chaffee knew that, in the past, von Wendel and Petitioner had had a "very loud, angry argu-

---

[12]We do not necessarily disagree with the district court's conclusion that the California Supreme Court's factual findings with respect to the other eight witnesses are not fairly supported by the record; we simply do not reach the issue.

[13]Respondent suggests that, because the state-court referee found that some of Cho's statements were inadmissible hearsay, we cannot consider those statements. We disagree. The California Supreme Court conducted an independent review and did not adopt any of the relevant hearsay determinations. Indeed, as noted in text, the California Supreme Court addressed the potential effect of Cho's *full* testimony.

ment," and Chaffee feared that the prosecution would bring out that incident in cross-examination to impugn Petitioner's character.

The characterization of Chaffee's failure to call von Wendel as a tactical decision is not fairly supported by the record. As the district court explained, von Wendel's testimony regarding the "angry argument" is inadmissible character evidence. Respondent did not challenge that conclusion before the district court, and he does not challenge that conclusion before us. To the extent that Respondent argues that the state trial court would have admitted plainly inadmissible evidence, we find no support in the record or in the law for that conclusion.

**[7]** Additionally, Chaffee had not learned the existence of Turley or Cho (nor even interviewed von Wendel). Chaffee accordingly had not learned how they would testify. Any tactical decision not to call von Wendel as a witness was, therefore, wholly uninformed, because Chaffee believed— incorrectly—that no evidence corroborated Vivian Cercy's testimony concerning a blond man named "Bo." In other words, Chaffee's failure to call von Wendel cannot be excused as a tactical decision because he did not have sufficient information with which to make an informed decision. *See, e.g.*, *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008) ("Counsel's ineffective assistance . . . cannot be excused as strategic. He failed to conduct an investigation sufficient to make an informed judgment. To the extent that his decisions reflected any tactical considerations, his approach . . . cannot be considered an objectively reasonable strategy, even when viewed under the highly deferential *Strickland* standard."); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) ("Although trial counsel is typically afforded leeway in making tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision."); *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002)

("Although defense counsel is empowered to make such strategic decisions, *Strickland* demands that such decisions be reasonable and informed.").

**[8]** We therefore must consider whether there is a "reasonable probability" that the jury would have reached a different verdict had it heard the testimony of Turley, Cho, and von Wendel. Before discussing the details of their testimony, we note that, as the California Supreme Court put it, corroboration of Vivian Cercy's testimony was "critical." *In re Thomas*, 129 F.3d at 57. Corroboration is always helpful. But it was "critical" here because, by itself, Cercy's testimony was not particularly believable. Cercy was a transient, who was missing throughout trial. Without any corroboration, her story about a tall, thin, blond "Bo" arguing with the murder victims before hearing "firecrackers," followed by a strange incident with yet another man in a trench coat or pea coat threatening her life, appears to be fantasy. Indeed, the prosecution offered a rebuttal witness, Vincent Johnson, who testified that he was told that Cercy had made it all up.[14]

In order to convict Petitioner, the jury had to decide that Cercy's story was—as her seemingly incoherent testimony suggested—loony; a complete fabrication. Indeed, the prosecutor repeatedly made that point in his closing argument: "Is she being truthful . . . ?"; Vivian's "story" "makes no sense[ ] at all[;] [n]o sense at all."; "She had no knowledge of what went on that night."; Vivian's testimony is a "little charade," "truly amazing," "really amazing," "fantastic, absolutely fantastic," "ludicrous . . . ludicrous"; "Come on, Vivian. Come on, Vivian. It is a good thing you're out of town, you would probably be charged with perjury."; "[T]he defense has been contrived. The testimony of Vivian Cercy is ridiculous, at best, perjurious at worst."

---

[14]During habeas proceedings, Petitioner submitted a signed declaration from Vincent recanting, at least to some extent, that testimony. We need not consider the effect of that declaration here.

THOMAS v. CHAPPELL

**[9]** Thus, it is no surprise that the California Supreme Court listed as the very first "crucial question[ ]": "Did Bo exist?" *In re Thomas*, 129 P.3d at 57. Indeed, in this proceeding, even Petitioner's trial counsel testified "that he was unsure Bo existed." *Id.* at 58. The pivotal question, then, is whether a reasonable investigation would have uncovered evidence that would have corroborated Cercy's testimony so as to create a reasonable doubt as to Petitioner's guilt.

Turley's testimony would have been the least helpful. He was not present at Rainbow Village during the murders, but he could have testified that a tall, thin, blond man who followed the Grateful Dead, and whose nickname was "Bo," existed.

Cho's testimony may have been most important. He would have testified that, on the morning after the murders, in Rainbow Village, he had a conversation with a tall, thin, blond man named "Bo" and another man named Weston. When he asked them what they had done the previous night (the night of the murders), Bo responded that either "I" or "we" "went swimming into the bay last night." Weston "suddenly jabbed" Bo with his elbow and "gave him a look like don't say anything more." The conversation ended, and Bo and Weston left the bus. Cho never saw Bo again. Cho's testimony would have been extremely helpful to Petitioner's case: "Bo" existed; Bo was at Rainbow Village on the night of the murders; Bo was *at the scene of the crime* (the bay where the bodies were dumped) on the night of the murders; Bo and Weston acted suspiciously when Bo placed them at the scene of the crime; and Bo left Rainbow Village soon after. "Unless Bo had some innocent reason to go swimming in San Francisco Bay at night (and [Respondent] offers none) and an innocent reason to mention this late-night swim during a conversation about the murders (and [Respondent] offers none), Bo's statement strongly implicates him in the murders of [Mary] Gioia and [Greg] Kniffin, whose killer or killers had

dumped their bodies in the bay." *In re Thomas*, 129 P.3d at 70 (Kennard, J., dissenting).

Von Wendel would have testified that he discovered a bag on the porch of his boat on the morning after the murders. After he heard about the murders later that morning, he looked in the bag and discovered some mundane items, including shoes and a colorful serape. Later that day, a tall, thin, blond man—whom he later learned was named "Bo"—arrived to reclaim the bag. Bo, who seemed like he was in a hurry to leave, took the bag and drove out of Rainbow Village. Von Wendel's testimony also would have been extremely helpful to Petitioner's case: "Bo" existed; Bo was at Rainbow Village on the night of the murders; Bo laid claim to a pair of shoes and a colorful serape, two items that Greg was wearing the night of the murders but that the police never recovered; and Bo left Rainbow Village that day, apparently in a hurry.

**[10]** In our view, the additional testimony recounted above —even without the additional testimony of eight more witnesses—corroborates Cercy's testimony such that there is a reasonable probability that the jury would have found a reasonable doubt as to Petitioner's guilt. Indeed, the jury was instructed to acquit Petitioner if the evidence was "susceptible to two reasonable interpretations, one of which points to [Petitioner's] guilt and the other to his innocence." There is a reasonable probability that a conscientious jury, presented with the witnesses corroborating Cercy's testimony, would find "reasonable" the interpretation pointing to Petitioner's innocence. Once the interpretation pointing to Petitioner's innocence were found, reasonable doubt would exist. *See People v. Wilson*, 838 P.2d 1212, 1221-22 (Cal. 1992) (relating reasonable alternative interpretations to reasonable doubt). Even with no corroboration whatsoever of Cercy's seemingly crazy testimony, or of even the existence of "Bo," the jury struggled to reach a verdict and requested readbacks related to her testimony. With the additional testimony that the state court found

should have been located by counsel—Bo existed, Bo was indisputably at Rainbow Village the night of the murders, Bo and Weston were even at the scene of the crime, Bo and Weston acted suspiciously the next morning, and Bo and Weston hastily left Rainbow Village the next day—there is a reasonable probability that the jury would have acquitted Petitioner. *Cf. Smith v. Cain*, 132 S. Ct. 627, 630-31 (2012) (applying the same "reasonable probability" standard in the context of a *Brady* violation and concluding that, even though "the jury *could* have disbelieved" evidence contrary to the non-disclosed evidence, the Court had "no confidence that it *would* have done so").

**AFFIRMED.**

O'SCANNLAIN, Circuit Judge, dissenting:

The majority finds *Strickland* prejudice based on two conclusions: that the case against Ralph International Thomas was very close and that the testimony of three would-be witnesses would have been "extremely helpful" in corroborating the testimony of key defense witness Vivian Cercy. Maj. op. 4995, 4999. Neither conclusion is warranted. The case against Thomas was stronger than the majority suggests, and the insubstantial testimony of those three witnesses would not have sufficiently corroborated Cercy's testimony or otherwise undermined the State's case. Thomas is therefore not entitled to habeas relief on the basis the district court gave, and I respectfully dissent.

I

This case was not as close as the majority suggests.

Mary Gioia and Greg Kniffin were killed by gunshot wounds typical of a high-powered rifle or shotgun, but incon-

sistent with a handgun. Thomas owned a high-powered rifle that, based on its peculiar features, was likely to have been used effectively only by someone familiar with it. Thomas shot the rifle the night before the murders, showing that he indeed knew how to use it effectively. Moreover, Thomas was with the victims soon before they were killed and was visibly angry. His pipe placed him at the crime scene. Thomas changed clothes in the middle of the night. After the murders, his rifle mysteriously went missing, yet testimony suggested that Thomas himself returned the rifle's case to his car early in the morning after the murders.

Thomas's statements and other conduct after the murders reflected consciousness of his guilt and raised further suspicion: Thomas was able to identify Mary's body when it remained partially underwater and before its sex was apparent. After the murders, he asked another Rainbow Village resident to hold his gun-cleaning kit and ammunition. As an alibi, Thomas claimed to have walked 16.8 miles in the middle of the night. That was improbable in itself, and more improbable given that Thomas generally went to bed early (around 9 p.m.). Indeed, police officers assigned to the areas Thomas claimed to have been walking did not recall seeing him. Thomas also gave inconsistent statements to police about whether his ammunition had been stolen, about his interactions with Mary and Greg, and about his pipes. He said that he could think of plenty of reasons why someone would want to murder Mary and Greg, then could not name one.

Not only was the State's case strong, but Thomas's defense —based largely upon Vivian Cercy's testimony—was weak. Cercy's testimony was imprecise, her answers were meandering and undermined her credibility, and her statements conflicted with each other and with those of other witnesses. Cercy described the man she called "Bo" as brown-haired, then as blond. She testified that the woman she saw arguing (purportedly Mary Gioia) was wearing "dark brown pants," but the pathologist who performed the autopsy on Mary testi-

fied that she wore blue denim shorts and purple pants. One of the police investigators testified that Cercy reported having "quite a bit to drink" on August 15, raising doubts about her perception. Cercy repeatedly testified that she was minding her own business on the night of the murders and therefore was not always paying close attention to what she claimed to have observed. Her testimony was tainted by discussions she had with others, such as the notoriously unreliable "Stagger Lee" Andersen, an oft-intoxicated one-time resident of Rainbow Village. (Andersen was so unreliable that the district court did not credit his testimony.) Cercy's estimates of the timing of events that night seemed to lack any firm basis. She could give almost no description of a man who knocked on her window and spoke with her from what was, apparently, only a few feet away. Although she said that this man threatened her life, she did not drive herself and her two young daughters to safety.

In the face of this evidence, it is understandable that six California Supreme Court justices concluded that the State's case would have "established in a reasonable juror's mind"— even the mind of one who had heard *all* the post-conviction record evidence cited by the majority—"the near certainty" that Thomas killed Mary and Greg. *In re Thomas*, 129 P.3d 49, 67 (Cal. 2006).

In casting this case as "close," maj. op. 4993, the majority emphasizes that the jury deliberated for nearly five days and asked for read-backs of testimony, maj. op. 4993-94. But the majority sidesteps the crucial details. Although the jury deliberated for five days, by the third day it asked about the difference between first- and second-degree murder and by the fourth day it wanted a hard copy of the jury instruction stating the difference between first- and second-degree murder. These "objective clues" (maj. op. 4993) suggest that the jury was focusing on what kind of murder Thomas committed, not on whether he killed Mary and Greg at all. (I note that none of the additional testimony cited by the majority suggests that

Thomas should have been convicted of second-degree murder rather than first-degree murder; it suggests only—and feebly —that Thomas was not the killer at all. *See infra* Part II.) The majority is not justified in casting aside the California Supreme Court's near-unanimous determination that Thomas was, to a "near certainty," the murderer.

## II

Having pitched the case to be closer than it was, the majority then finds doubt about Thomas's guilt based on the would-be testimony of Jong Cheol Cho, Claus von Wendel, and Randy Turley. Their testimony, the majority maintains, would have been "extremely helpful" in corroborating Cercy's testimony and supporting the theory that someone called Bo had committed the murders. Maj. op. 4998; *see id.* at 4998-5000.

I cannot agree. To begin with, Cercy's testimony was essentially beyond corroboration. It is hard to corroborate testimony so imprecise, at times contradictory, and often incredible, from someone who—as even the cold record shows—was not clearheaded, reliable, or perceptive. As Thomas's current counsel conceded, "Cercy was hardly a dream witness" and "her patterns of speech and thought were obviously eccentric." That understates the matter.

But even assuming that Cercy's gossamer-thin testimony was susceptible of corroboration, the three further witnesses' testimony would not create a reasonable probability of a different guilt-phase outcome. The facts those witnesses may have offered—that a "Bo" existed, that he said he had gone swimming in the bay the night of the murders, and that he left on von Wendel's boat a bag that contained no murder weapon and only some mundane, common items—do almost nothing to sharpen Cercy's self-refuting, implausible testimony. Nor do they otherwise undermine the case against Thomas: those witnesses do not refute any of the evidence against him, such as the fact that Thomas owned a rifle that would have been

difficult for anyone else to fire and that was quite possibly the murder weapon.

That a "Bo" may have said that he swam in the bay the night of the murders or picked up a bag of run-of-the-mill belongings adds little. Indeed, the swimming-in-the-bay comment may cut against James Bowen's alleged guilt: If this "Bo" had killed Mary and Greg, he would presumably have been more careful than to remark to others, hours after dumping the bodies in the bay, that he had gone swimming there. Perhaps the more natural conclusion is that "Bo" was being honest and did not realize that his comment would implicate him. And whether Cho accurately related "Bo" 's statement is open to doubt. When Cho was pressed about a discrepancy between his sworn declaration and his hearing testimony, he defended the discrepancy by stating, "English is not my native language, and therefore I miss all this." We should not overturn a jury verdict in heavy reliance upon a single sentence reported through an intermediary who may well not have understood or repeated the sentence accurately.

And the bag on von Wendel's boat shows almost nothing. Rainbow Village was a place where people came and went—where people slept in their cars, on the ground, and in others' buses. That someone staying there may have left a bag of shoes, books, a serape, and a driver's license (and no gun) in an apparently secure spot hardly merits great suspicion. The district court said that items in the bag "corresponded to the shoes and poncho that were missing from Kniffin's body when it was found." But Randy Turley testified that "Bo" liked to wear serapes. And it is no surprise that "Bo" would have an extra pair of shoes in a bag containing his belongings. Von Wendel's testimony—about an article of clothing commonly worn by "Bo" (a serape) and an article commonly worn by most American adults (shoes)—does not corroborate Cercy or undermine the other evidence of guilt.

Finally, I do not understand why the majority disregards the rebuttal testimony of Vincent Johnson. On rebuttal, the prosecutor asked Johnson, "[W]hat exactly did [Vivian Cercy] tell you regarding anything she may have seen [the night of the murders]?" Johnson replied, "She told me, basically, that everything she said was, was—she was told to say by [Rainbow Village resident and Cercy's on-and-off boyfriend] Harry Shorman, and that she basically hadn't seen anything, hadn't seen anything." Johnson's testimony makes it all the more difficult to imagine a different result in this case. Even if the three additional witnesses would have established that a "Bo" existed and that Cercy had not "made him up," Johnson's rebuttal decisively supported the prosecution's view that she was not testifying credibly and was acting as a mouthpiece for eccentric grandstander Harry Shorman.[1]

### III

In sum, the evidence on which the majority relies—Cercy's narrative, Turley's confirmation of a "Bo" 's existence and description, Cho's testimony that "Bo" made a "swimming into the bay" comment, and the bag on von Wendel's boat—when set against the actual case against Thomas, does not "undermine confidence in the outcome" of his guilt-phase trial. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

I would reverse the district court's judgment granting a writ of habeas corpus.

---

[1]The majority says that, during habeas proceedings, Thomas submitted a declaration in which Johnson at least partially recanted his testimony. Maj. op. 4997 n.14. The declaration is more equivocal than the majority suggests and, in any event, Johnson testified later that he was not lying when he testified that Cercy had told him that "everything she said was" what she "was told to say by Harry Shorman" and that "she basically hadn't seen anything." The majority states that it "need not consider the effect of that declaration here." *Id.* But if the majority "need not consider" that later declaration, it is unclear why the majority is justified in effectively disregarding Johnson's rebuttal testimony in considering *Strickland* prejudice.