**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEONDRE ARTHUR STATEN, *Petitioner-Appellant*, | No. 17-99008 |
| v. | D.C. No. 2:01-cv-09178-MWF |
| RONALD DAVIS, Warden, Warden, California State Prison at San Quentin, *Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted January 13, 2020
Pasadena, California

Filed June 18, 2020

Before: Susan P. Graber, Marsha S. Berzon, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Berzon

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Deondre Staten's habeas corpus petition challenging his conviction and capital sentence for murdering his parents.

Staten alleged that he received ineffective assistance of trial counsel because his lawyer failed to present additional evidence of third-party culpability. The panel held that Staten's trial counsel rendered deficient performance by failing to present testimony that gang members appeared to claim credit for the murders, but that counsel did not perform deficiently by failing to find and call a gang expert to counter the testimony of the prosecution's gang expert. The panel held that fairminded jurists could disagree as to whether the testimony of five witnesses regarding the gang members' boasting was reasonably likely to have changed the outcome of Staten's trial, and that the California Supreme Court's summary denial of the ineffective-assistance claim was therefore not objectively unreasonable.

Staten also brought claims that a contract for indigent defense services between Los Angeles County and the Pomona Contract Lawyers Association (PCLA) violated his constitutional rights because it interfered with his ability to obtain second trial counsel. The panel held that the California Supreme Court's summary denial of these claims was reasonable because there is no evidence in the record that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

trial counsel was appointed to represent Staten pursuant to the contract, was a member of the PCLA at the time the initial contract was signed, or was a signatory to the original contract.

Judge Berzon dissented from the majority's holding that the California Supreme Court's imputed holding as to whether trial counsel's deficient performance likely prejudiced the outcome of Staten's trial was a reasonable application of clearly established Supreme Court law. She would hold that there was prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), that any conclusion to the contrary was unreasonable, and that 28 U.S.C. § 2254(d) therefore does not preclude habeas relief.

**COUNSEL**

Jerry L. Newton (argued), Carmel, California; Norman D. James, Corvallis, Montana; for Petitioner-Appellant.

Scott A. Taryle (argued), Supervising Deputy Attorney General; A. Scott Hayward, Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Attorney General's Office, Los Angeles, California; for Respondent-Appellee.

**OPINION**

GRABER, Circuit Judge:

Petitioner Deondre Staten appeals the district court's denial of habeas relief in this capital case. Petitioner was convicted in state court, after a jury trial, of murdering his parents. The jury returned verdicts of death for both murder counts. On federal habeas review, Petitioner alleges that he received ineffective assistance of trial counsel because his lawyer failed to present additional evidence of third-party culpability. His other claims allege that a contract for indigent defense services between Los Angeles County and the Pomona Contract Lawyers Association ("PCLA") violated his constitutional rights because it interfered with his ability to obtain second trial counsel. The district court denied his petition. Petitioner timely sought our review. We affirm.

## BACKGROUND[1]

### A.  *The Crimes*

Petitioner lived with his parents, Arthur and Faye Staten, in Los Angeles County.  Petitioner's parents owned and managed a beauty supply store and salon.  They had four life insurance policies worth, in total, more than $300,000.  In August 1990, Arthur and Faye revised three of those policies to name Petitioner as the sole beneficiary and the fourth policy to name Petitioner and his brother as co-beneficiaries. The prosecution argued that Petitioner murdered his parents to obtain the proceeds from those policies.

The prosecution presented evidence that Petitioner and his father had a strained relationship, that they argued often, and that Arthur had evicted Petitioner from the parents' house on prior occasions.  Prosecution witnesses testified that Petitioner had boasted that he would "take his father out," that he would "take care of him," and that he would come into a large sum of money if his parents died.  Two witnesses testified that Petitioner told them that they would be paid a "five-digit" sum of money if they would "bump off" two people who lived around the corner and owned a beauty supply and hair salon.  A witness recalled that Petitioner, while watching a television program about the Menendez brothers,[2] commented that the brothers "did it wrong" and "shouldn't have gotten caught."

---

[1] The facts, as recited here, are not disputed.

[2] The Menendez brothers were convicted of the 1989 murders of their parents. *Menendez Brothers Sentenced to Life in Prison*, N.Y. Times, July 3, 1996, at A15.

In September 1990, Arthur and Faye left for a vacation, leaving Arthur's truck at a relative's house and leaving Faye's car for Petitioner to drive. Arthur and Faye kept a .38 caliber revolver with a brown handle at the beauty supply shop. Petitioner's friend, John Nichols, testified that he saw Petitioner carrying that revolver about a week after Arthur and Faye left. Nichols testified that Petitioner told him on more than one occasion that he had hollow-point bullets in the revolver.

Two or three evenings before Arthur and Faye returned, Nichols and another friend were at Petitioner's house when Petitioner told them that he heard something in the backyard. Petitioner took the revolver and looked around in the backyard but said that he did not see anyone. Petitioner said that he was worried because he had received threatening phone calls from members of a local Latino gang, the East Side Dukes ("ESD"), whose territory bordered Petitioner's street. Petitioner and his family are African-American, and witnesses testified that there was animosity between the ESD and the African-American community. The following day, Petitioner showed his friends the letters "ESD" spray-painted on the backyard patio.

Arthur and Faye returned from vacation on October 11, 1990, and stayed with their relatives overnight and for most of the next day. Petitioner asked his cousin, who lived near where Arthur and Faye stayed, to call him when they left to drive home. Petitioner called his cousin repeatedly that day to find out when his parents would return home. Petitioner's friends testified that, throughout the afternoon, Petitioner was drinking malt liquor, acting fidgety, and wearing a

characteristic pair of 501 Levi's blue jeans[3] with the brown handle of a revolver sticking out of his waistband. Petitioner's relatives invited him to join his parents for dinner, but he declined. He told them that his mother's car was not working.

According to the timeline established by prosecution witnesses, Petitioner's parents left to drive home between 11:20 and 11:25 p.m. on October 12. Petitioner's neighbor, Bertha Sanchez, testified that she saw Arthur's truck arrive home at approximately 11:40 p.m. Sanchez and her husband testified that, sometime between 11:50 and 11:55 p.m., they heard three gunshots. Another neighbor testified that he also heard gunshots around that time. No witness testified to hearing shots fired later than that. At 12:04 a.m., Petitioner's aunt called the parents' house; Petitioner answered. He told his aunt that his parents had not yet arrived home and that he was getting ready to leave. At 12:31 a.m., she called again and, when Petitioner answered, he told her that his parents had arrived home, but he did not offer to put them on the line as he normally did. At some point after midnight, Sanchez testified that she heard what she thought was Arthur's truck starting, driving away, and returning about 20 minutes later.

Around 1:00 a.m., Petitioner knocked on another neighbor's door and said that his parents had been killed. He was crying and seemed to be dry-heaving. The neighbor went with Petitioner to his house and found Faye's body face down near the entryway and Arthur's body in a bedroom. The words "ESD kills" were spray-painted on a mirrored wall in the living room.

---

[3] A friend of Petitioner's testified that Petitioner had the nickname "501 man" because he often wore 501 Levi's blue jeans.

When police arrived, Petitioner did not answer their questions and appeared to be in a trance-like state. The neighbor testified that Petitioner was overdoing or "faking" his state of mind, because he had been able to communicate earlier. Petitioner had a cut with dried blood on one finger and was wearing shorts. Later, at the police station, Petitioner collapsed and appeared unconscious but was revived and fully oriented by the time paramedics arrived, and he stated that he did not require medical attention.

Arthur died of a single gunshot wound to the back of the head, caused by a .38 or .357 caliber hollow-point bullet. Faye died of multiple stab wounds, seven of which could have been fatal. The police found no evidence of forced entry or robbery, and Faye's purse was left on a table in plain view with cash inside. Police found a book of historic *Los Angeles Times* headlines on a table in the den, open to the front page describing the Sharon Tate murders[4] with a page of handwritten notes that appeared to be "verses to a potential song" on the facing page. Investigators found Petitioner's fingerprints on that page.

The prosecution and the defense stipulated that blood sample evidence taken throughout the house showed that some of the blood came from Arthur and that some of the blood could have come from either Petitioner or Faye. A partial handprint on the mirrored wall below "ESD kills" matched Petitioner's handprint. An expert testified for the prosecution that there was a 90-percent probability that the same person spray-painted the "ESD" on the back porch and

---

[4] In 1969, actress Sharon Tate and four others were murdered by Charles Manson's followers. Dial Torgerson, *"Ritualistic Slayings": Sharon Tate, Four Others Murdered*, L.A. Times, Aug. 10, 1969, at A1.

"ESD kills" inside the house. The paint from both samples was made up of the same commercial formula, which matched a can of spray paint found in a hall closet.

On October 14, police arrested Petitioner's friend, Nichols, for a probation violation. Nichols agreed to cooperate with the police and met with Petitioner while wearing a wire. In the recording played for the jury, Petitioner claimed that he had gotten rid of the .38 revolver before his parents returned home. He asked Nichols to tell the police that Staten did not have a revolver, reassuring him that the police would not find it and that there would be no case if they stuck to their stories. In the recording, Petitioner said: "[T]hey can't do shit. All they can do is close the mother fucker. If they still can't find it, I'm still going to blame it on the Dukes."

After an initial investigation, the sheriff's department concluded that the murders were not gang-related. Detective David Watkins testified as a gang expert for the prosecution. He testified that the graffiti found on the back patio and in the house did not match the distinctive style favored by the ESD. Detective Watkins and two of the Statens' neighbors drew examples of typical ESD lettering, and the prosecution presented exemplar photographs of ESD graffiti to the jury. Detective Watkins also testified that a gang would not place its graffiti out of public view, but would instead tag the front of the house and include the names of the targets and gang members to increase the level of intimidation.

Detective Watkins further testified that the ESD tended to kill in drive-by shootings or after calling someone outside. He had not seen the gang engage in a home-invasion murder of neighborhood residents. He also testified that the ESD

generally focused on killing rival gang members and, when non-combatants were killed, it tended to be the result of collateral damage. ESD members denied involvement in the murders to an investigator. A neighbor also testified that he had asked ESD members about the murders and they denied involvement, even though they had readily admitted to a drive-by shooting at another house.

A relative of Petitioner's, with whom he stayed after his parents' deaths, testified that she did not see him wear blue jeans until he bought a new pair about three weeks after the killings. She twice searched the Statens' house, the beauty shop, and the salon, but she did not find any jeans in Staten's size. Detectives also searched for Petitioner's jeans and the missing .38 revolver, but found neither.

The defense theory at trial was that ESD gang members committed the murders when Petitioner left the house to get food between 12:45 and 1:00 a.m. The defense introduced evidence that Petitioner had a strong relationship with his parents and was especially close to his mother. Petitioner testified that he never spoke to friends about killing his parents for insurance money. Petitioner and other witnesses testified about threats that ESD had made against Petitioner and about intimidation and harassment from ESD members in their neighborhood.

Petitioner testified that he took the .38 revolver from his parents' beauty supply shop for protection because he had received threatening calls from ESD members. Petitioner testified that the revolver disappeared during a party while his parents were out of town, but he did not mention it to Nichols because he suspected that one of Nichols's friends had taken the weapon. Petitioner said that he had cut his finger while

gardening, when he was trying to get the house and yard cleaned up before his parents returned home, and that he might have left blood in the house when he walked through it looking for a bandage. He testified that he had worn shorts all day and that his blue jeans were either in his bedroom or in the laundry. He also testified that, while working on lyrics for a rap song, he looked through the book of historic headlines. He was looking for headlines about Dr. Martin Luther King, Jr., not about the Sharon Tate murders.

The defense highlighted inconsistencies in the neighbors' initial accounts to the police regarding whether and when they heard gunshots. And Petitioner testified that his parents did not arrive home until shortly after midnight. According to Petitioner, when his aunt called the first time, around 12:04 a.m., his parents were not yet home. When his aunt called back at 12:30 a.m., his mother indicated that she did not want to talk on the phone. Petitioner testified that he left in his father's truck to get food between 12:30 and 12:45 a.m. and returned home around 1:00 a.m. after he realized that he had left home without cash. When he returned, he discovered his parents' bodies and the "ESD kills" graffito inside the house.

The police never found the murder weapons, and no gunshot residue was found on Petitioner's hands. Petitioner did not file an insurance claim during the three months between the killings and his arrest.

B. *Procedural Background*

The jury found Petitioner guilty of both murder counts and found true the special circumstances of multiple murders and murder for financial gain. The jury returned verdicts of

death for both murder counts. The trial court sentenced Petitioner to death on January 16, 1992.

The California Supreme Court affirmed the convictions and sentence. *People v. Staten*, 11 P.3d 968, 988 (Cal. 2000). The United States Supreme Court denied certiorari. *Staten v. California*, 534 U.S. 846 (2001).

Petitioner filed his first state habeas petition in the California Supreme Court in 2002, alleging ineffective assistance of trial counsel for failing to present additional evidence of third-party culpability (corresponding to Claim 7 in this case). The California Supreme Court denied the petition "on the merits for failure to state a prima facie case for relief" and, alternatively, dismissed most of the claims as untimely.

In a second state petition, Petitioner reiterated the ineffective assistance of counsel claim. He also argued that the denial of a second appointed trial lawyer violated due process and equal protection principles and that his trial counsel rendered ineffective assistance by making an inadequate showing in support of his request for second counsel. The California Supreme Court dismissed all claims as untimely and procedurally barred, and the court also summarily denied all claims on the merits for failure to state a prima facie case.

Petitioner filed a third state habeas petition in which he asserted that the terms of a contract between Los Angeles County and the PCLA violated his constitutional rights. Under the terms of the contract, the County paid the PCLA a flat fee to provide indigent defense services when the public defender's office had a conflict. The public defender's office

had a conflict of interest in Petitioner's case, and so could not represent him. Instead, the trial court appointed John Tyre to represent Petitioner at trial. Petitioner alleged that Tyre was appointed pursuant to the contract and that there was a contractual limitation of one lawyer per case. For the PCLA to add a second lawyer to a case, Staten alleged, either a PCLA lawyer would have to provide the services pro bono or the PCLA would have to reimburse the County for fees paid to a non-PCLA lawyer. Petitioner argued that those funding limitations were the reason why he did not have a second lawyer at trial, and not the trial court's stated reason that the case was not so complex as to require a second lawyer. He argued that the contract thus created a conflict of interest in violation of his Sixth Amendment right to counsel (Claim 11 in this case); and he reasserted his previous due process, equal protection, and ineffective assistance claims regarding the denial of a second counsel in light of the PCLA contract (Claims 1, 2, and 3 in this case). The California Supreme Court dismissed the claims as untimely and repetitive and also denied them on the merits for failure to state a prima facie case for relief.

Petitioner filed an initial 28 U.S.C. § 2254 petition in the district court in 2003 and a first amended petition in 2005. Petitioner moved for an evidentiary hearing on several claims, including those at issue in this appeal. The district court denied the motion for an evidentiary hearing and denied all claims, except Claim 11, for failing to meet the requirements of 28 U.S.C. § 2254(d)(1). After additional briefing on Claim 11, the district court granted summary judgment to the State and entered judgment denying the petition.

The district court granted a certificate of appealability for Claims 1, 2, 3, 7, and 11. Petitioner timely filed a notice of appeal.

## STANDARDS OF REVIEW

We review de novo the district court's denial of a petition for habeas corpus. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010). We review for abuse of discretion the district court's determination that a petitioner is not entitled to an evidentiary hearing. *Id.*

Because Petitioner filed his § 2254 habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, governs his petition. *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). Under AEDPA, we must defer to a state court's decision with respect to any claim that was adjudicated on the merits unless the decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## DISCUSSION

The California Supreme Court denied Petitioner's claims on state procedural grounds and summarily on the merits. Although the decision "is unaccompanied by an explanation," Petitioner still has the burden to show that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Because we conclude that Petitioner's claims do not survive review under § 2254(d), we decline to address the State's procedural default arguments. *Franklin v. Johnson*, 290 F.3d 1223, 1232–33 (9th Cir. 2002).

A. *Ineffective Assistance of Counsel (Claim 7)*

Petitioner argues that his trial counsel, John Tyre, rendered deficient performance because he failed to investigate and present evidence that the ESD claimed credit for the murders and because he failed to call a gang expert to counter the prosecution's expert.

To prevail, Petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Petitioner must further show that the California Supreme Court's denial of his ineffective assistance of counsel claim was not only "incorrect or erroneous," but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Only where "there is no possibility fairminded jurists could disagree" may we reverse the state court's ruling on the claim. *Richter*, 562 U.S. at 102; *see also id.* at 105 ("Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).").

1. *Deficient Performance*

Under the first prong, *Strickland* requires a showing that counsel's performance was deficient, measured by a standard

of reasonable professional assistance. This standard gives a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 687 (internal quotation marks omitted). Below, we consider Tyre's failure to: (a) investigate and present evidence that ESD members claimed credit for the murders; and (b) call a gang expert.

a.  *Evidence that ESD Members Claimed Credit for the Murders*

We conclude that Tyre rendered deficient performance by failing to present testimony that ESD members appeared to claim credit for the murders. It was objectively unreasonable for the California Supreme Court to conclude otherwise. *Richter*, 562 U.S. at 102.

Robert Oseguera, Brian Ellis, and Keith Taylor stated in declarations that on the morning after the murders they saw a car containing ESD members drive by the Staten home and say, "yeah we got them." Pat Oseguera declared that she also saw ESD members drive by, but she did not hear what they were bragging about. Quincy Murphy stated in a declaration that he saw ESD members drive by "giving us hard stares."

Tyre interviewed all five witnesses. Both Pat Oseguera and Ellis mentioned the incident to him. Ellis stated that Tyre did not seem particularly interested in the incident. The record thus suggests not that Tyre thoroughly probed the issue and determined that the witnesses' stories were not credible, but rather that he did not recognize the possible

significance of the incident and failed to investigate it fully. *Strickland*, 466 U.S. at 690–91.

Tyre's choice not to present evidence of a direct connection between the ESD and the murders was not reasonable. Although the witnesses' declarations are not entirely consistent with one another regarding certain details about the incident, the basic account is consistent: ESD members drove by and behaved in a way that suggested that they were claiming credit for the murders. Tyre called Ellis, Murphy, and the Osegueras as witnesses, suggesting that he had determined they were sufficiently credible. Any credibility problems they did have were already before the jury; asking a few additional questions would not have changed the credibility calculus. It would not have been a reasonable trial strategy for Tyre to choose not to present his only evidence (besides the "ESD" graffiti at the Staten residence) linking the ESD to the murders simply because the witnesses' accounts were not consistent on every detail.

The testimony of those witnesses fit squarely into Tyre's defense theory: that ESD gang members committed the murders when Petitioner left the house that night. The only direct evidence presented at trial that the murders were gang-related was the presence of "ESD" graffiti, of disputed authenticity, found at the house. *Staten*, 11 P.3d at 974. Tyre's choice not to make use of readily available evidence, from apparently disinterested witnesses, that would have enhanced his chosen defense theory was unreasonable. *See Alcala v. Woodford*, 334 F.3d 862, 869–71 (9th Cir. 2003) (concluding that counsel was deficient for failing to present testimony and records that would have been "far more helpful" for establishing the defense's theory than the evidence that was presented); *Lisker v. Knowles*, 651 F. Supp.

2d 1097, 1121 (C.D. Cal. 2009) (noting that, where the defense strategy was to show that the petitioner did not commit the murder, there was "no logical reason" for failing to present evidence that someone else had); *cf. Clark v. Chappell*, 936 F.3d 944, 979 (9th Cir. 2019) (per curiam) (declining to determine that counsel had provided ineffective assistance for failing to present third-party culpability evidence where trial counsel considered that theory but reasonably rejected it), *amended on denial of reh'g*, 948 F.3d 1172 (9th Cir. 2020). Testimony that the ESD had claimed credit for the murders would not have weakened other aspects of the guilt- or penalty-phase defense. The potential benefit of introducing the evidence was high, and any disadvantage was negligible.

In short, it was objectively unreasonable for the California Supreme Court to conclude that Tyre's performance was not deficient. *Richter*, 562 U.S. at 102.

b. *Gang Expert*

By contrast, we conclude that Tyre did not perform deficiently by failing to find and call a gang expert to counter the testimony of the prosecution's gang expert. Tyre stated in a declaration that he sought funds for a gang expert, but that the trial court denied the request. Tyre "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 107. The prosecution's gang expert, Detective Watkins, testified that the graffiti found in and around the Staten home was not authentic and that the murders of Petitioner's parents were not gang-related. Rather than call a gang expert, Tyre chose to challenge Detective

Watkins' testimony through effective cross-examination and the presentation of other witnesses.

For example, Tyre challenged Detective Watkins's opinion that the "ESD" graffiti were not authentic by showing him and other witnesses samples of ESD graffiti that were consistent with the graffiti found at the scene. And Tyre elicited testimony from the assistant principal at the local high school that the graffiti at the Staten home looked like the ESD graffiti with which he was familiar. Tyre also cross-examined Detective Watkins regarding other violent activities by the ESD, and he questioned many neighbors regarding animosity between the ESD and African-Americans. Tyre questioned Petitioner and other witnesses about the history of threats that the ESD had made against them. Finally, Tyre challenged the prosecution's case directly by cross-examining the investigating detectives on their lack of substantive investigation into the possibility that the ESD committed the crimes. Tyre argued in closing that the detectives' refusal to investigate a possible gang killing reflected both an early bias and incomplete work.

Tyre's choice to undermine the prosecution's case with cross-examination and other witnesses, rather than through the presentation of a counter-expert, was a reasonable tactical decision given the known and available resources. *Id.* at 107; *see Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (emphasizing that the relevant inquiry under *Strickland* is whether "the choices made by defense counsel were reasonable" (internal quotation marks omitted)). At a minimum, it was not unreasonable for the California Supreme Court to conclude that Tyre's choice not to call a gang expert met *Strickland*'s deferential standard. *Richter*, 562 U.S. at 106–07.

2.  *Prejudice*

Claim 7 nevertheless fails because fairminded jurists could disagree as to whether the testimony of the five witnesses regarding ESD members' boasting was reasonably likely to have changed the outcome of Petitioner's trial. *Richter*, 562 U.S. at 102; *Strickland*, 466 U.S. at 694.  Thus, the California Supreme Court's summary denial of that claim was not objectively unreasonable.  *Lockyer*, 538 U.S. at 75.

The prosecutor acknowledged from the start that the case was "entirely circumstantial" and that he might not be able to prove that Petitioner "killed these people himself or by himself," but only that he was "involved in these murders." The murder weapons were never found, and the results of the blood sample tests were inconclusive.

But even though the prosecution's case was not overwhelming, there was compelling evidence of Petitioner's guilt.  Petitioner's friends testified that he talked about killing his parents and told them about his parents' life insurance policies, bragging of a windfall if his parents died.  He told a cousin on the night of his parents' funeral that it was "time to party and get high."  Another witness saw Petitioner, after his parents' deaths, opening a safe in his parents' bedroom that contained stacks of cash.  Petitioner had been carrying his parents' .38 revolver the day of the murders and had told friends he had hollow-point bullets for it.  The weapon used to kill his father was never found, but the bullets at the scene matched the caliber of the .38 revolver and were hollow-point bullets.  A partial handprint on the mirrored wall below the "ESD kills" graffito matched Petitioner's.  And there was no evidence of a forced entry or of entry into the backyard. Despite the inconclusive blood tests, Petitioner conceded that

his blood might be in the house, testifying that he had cut his finger earlier in the day and may have left a trail of blood. Petitioner, characteristically, had been wearing blue jeans on the day of the murders, but when police arrived at the scene he was in shorts. Detectives searched for his jeans but never found them, and the relative with whom Petitioner stayed after his parents' deaths testified that she did not see him wear jeans again until he bought a new pair about three weeks after the killings. And there was sufficient leeway in the timeline given by prosecution witnesses to permit the jury to conclude that events unfolded as the prosecution described. Against the backdrop of that evidence, a reasonable jurist could conclude that testimony about the overheard boasting of ESD members would not have had a reasonable probability of changing the outcome of the guilt phase of the trial.[5]

Additionally, although the defense that Tyre presented was not as strong as it could have been, he presented evidence that ESD gang members could have been responsible for the murders. The assistant principal testified that the graffiti appeared authentic. Tyre elicited testimony that ESD members had made threats against Petitioner personally; that there was animosity between the ESD and the African-American community; and that the ESD claimed territory in Petitioner's neighborhood, including the row of houses behind his house. The testimony about the ESD members'

---

[5] The dissent argues that much of the evidence that composed the prosecution's case is open to multiple interpretations and innocent explanations. But viewing the evidence in the light most favorable to Petitioner does not accord with AEDPA deference where the inquiry is whether a reasonable jurist *could* conclude that the deficient performance did not undermine confidence in the outcome. *Richter*, 562 U.S. at 111–12.

boasting could have bolstered the existing defense theory, but it was not a new theory that the jury never heard.

When we have found the omission of cumulative evidence prejudicial, the evidence has been so persuasive that it would have meaningfully altered the jury's view of the case. *See, e.g.*, *Vega v. Ryan*, 757 F.3d 960, 968, 973 (9th Cir. 2014) (per curiam) (holding that cumulative evidence was prejudicial where the omitted testimony of a priest "would have brought credibility" to the claims of another witness who had motivation to lie); *Cannedy v. Adams*, 706 F.3d 1148, 1164–66 (9th Cir. 2013) (holding that defense counsel's failure to present testimony about the victim's recantation was prejudicial in a "he said, she said" case where the defendant was the only defense witness). Here, by contrast, the omitted testimony may have been more direct than the evidence that Tyre presented, but it was no more reliable and would not have significantly changed the nature of the defense.

And in the cases in which we and the California Supreme Court have concluded that failure to present evidence of third-party culpability was prejudicial, the omitted evidence was far more compelling than it was here and would have supplemented weaker defense evidence than what Tyre put on in Petitioner's trial. In *Thomas v. Chappell*, 678 F.3d 1086 (9th Cir. 2012), for example, defense counsel presented a "bare defense" that a third party was responsible for the murder: the "seemingly incoherent" grand jury testimony of one woman that was read to the jury because she could not be located to testify at trial. *Id.* at 1092–93, 1100, 1105. Defense counsel failed to present testimony from several other witnesses that would have corroborated the woman's testimony, identified the man that she implicated, and

described that man's incriminating behavior and statements after the murders. *Id.* at 1106. The prosecution's case was also weaker than that against Petitioner: the prosecution presented no motive, murder weapon, witnesses to the crime, or fingerprint or blood evidence. *Id.* at 1103.

Similarly, in *In re Hardy*, 163 P.3d 853 (Cal. 2007), the evidence that defense counsel failed to present was more significant both in quantity and quality than the testimony that Tyre failed to elicit. There, the prosecution's key witness had made incriminating statements before and after the murder and there was evidence that his alibi was false. *Id.* at 886–87. Had defense counsel presented that testimony, it would not only have provided strong evidence of third-party culpability, but also would have undermined the critical testimony that implicated the defendant.[6] The testimony was all the more likely to have affected the outcome of the trial because there were no eyewitnesses, no witnesses to place the defendant at the crime scene, no forensic evidence, and no murder weapon or evidence that the defendant typically carried anything like the murder weapon. *Id.*

Here, the testimony that Tyre failed to present did not have similar probative value. The witnesses the jury would have heard from were either not new or not more credible.

---

[6] Although the California Supreme Court concluded that Hardy was prejudiced as to the theory that he was the actual killer, it ultimately held that his ineffective assistance of counsel claim failed because he could have been found guilty of murder under a derivative theory. *Hardy*, 163 P.3d at 887. On appeal, we held that was an unreasonable application of clearly established federal law because the prosecution's entire theory, including its arguments under the derivative theories, rested on the defendant's being the actual killer. *Hardy v. Chappell*, 849 F.3d 803, 820–21 (9th Cir. 2016).

And the testimony would have inconsistently described an incident that only implicitly implicated ESD members. Tyre performed deficiently because that was better evidence that ESD was responsible than anything he presented and there was no justifiable reason for him not to present it—not because the testimony was compelling. Tyre, unlike the defense counsel in *Thomas* or *Hardy*, offered a credible—if not strong—defense that included several witnesses connecting ESD gang members to Petitioner and to the neighborhood. But the jury rejected that theory, and the additional testimony would not have significantly changed that defense. Moreover, the inclusion of the testimony would have left the prosecution's case intact—it would not have undermined any of the evidence that the prosecution presented. And that evidence was stronger than that presented in either *Thomas* or *Hardy*: here, the prosecution presented evidence of a motive; testimony placing Petitioner at the scene at the time of the murders; and evidence that, on the day of the murders, Petitioner had been in possession of a firearm that was consistent with the murder weapon. The additional testimony would not have changed the light in which the jury viewed that evidence.

The dissent discusses additional evidence that Tyre did not present to the jury—regarding Petitioner's and Arthur Staten's drug dealing activity, gang associations, and the resulting tension with ESD—and argues that the evidence would have made the omitted testimony more persuasive. But Petitioner did not challenge Tyre's failure to present that evidence on appeal, so that issue is forfeited. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018). Even if we were to consider it, we would disagree with the dissent's suggestion that Tyre may have made a different decision about introducing that evidence had he considered the ESD

members' boasting. There were good reasons for Tyre to keep the evidence out intentionally. With or without the testimony that ESD members claimed credit, testimony about Petitioner's and Arthur Staten's drug dealing and gang associations could have damaged Petitioner's credibility, could have hurt the penalty phase defense, and—perhaps most significantly—could have provided the prosecution with another argument that Petitioner had a financial motive to kill his father. In our prejudice analysis, we cannot consider the cumulative effect of non-errors. *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018).

If we reviewed only for prejudice under *Strickland*, Tyre's failure to introduce the witness testimony might be enough to "undermine [our] confidence in the outcome." *Strickland*, 466 U.S. at 694. But when § 2254(d) applies, that is not the question. *Richter*, 562 U.S. at 105. Instead, the question is whether the state court reasonably could have concluded that the evidence of prejudice fell short of *Strickland*'s deferential standard. *Id.* at 111–12. Here, there were reasonable grounds for the California Supreme Court to conclude that the omitted testimony would not have altered the outcome.

B. *PCLA Contract Claims (Claims 1, 2, 3, and 11)*

Petitioner's remaining claims concern a contract between Los Angeles County and the PCLA. The contract provided that the PCLA would act as conflict counsel to represent indigent defendants when the public defender's office legally could not. The initial contract ran from November 1, 1990, to October 31, 1991. Under the terms of that contract, the PCLA agreed to represent up to 500 defendants during the contract year in criminal actions ranging from infractions and

misdemeanors to parole violations, guilty pleas, and felony trials, including capital cases. Los Angeles County paid a flat fee of $495,833 and agreed to pay an additional $991.67 for each defendant in excess of 500. Petitioner alleged that the trial court appointed his counsel, Tyre, under the terms of the initial contract. He further alleged that funding limitations contained in the terms of the contract were the reason why he did not have a second trial lawyer, which violated his constitutional rights.

Petitioner's claims concerning the contract fail for lack of evidence to support the underlying premise. There is no evidence in the record that Petitioner's trial counsel was appointed to represent Petitioner pursuant to the contract. Nor is there evidence that Tyre was a member of the PCLA at the time the initial contract was signed or was a signatory to the original contract. The PCLA contract is not mentioned in the trial record. The California Supreme Court could reasonably have concluded that Petitioner's allegations on all those points are unsupported and that his argument therefore collapses.

Because of this lack of support, the California Supreme Court's summary denial of Petitioner's claims was reasonable. *See id.* at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012) (noting that, "if a district court would be within its discretion in denying an evidentiary hearing, a state

court's similar decision is probably not objectively unreasonable").

The state court had a copy of the original PCLA contract, which neither included a signature page for the contracting PCLA attorneys nor named them. But the original contract contained a brief description of the contractors, stating "that each of the attorneys has practiced law for more than ten (10) years." During the first contract year—the year in which Tyre was appointed to represent Staten—that description *did not apply to Tyre*, who had been practicing for only eight years. The description did apply to Tyre during subsequent extensions for the second and third contract years, when the record shows that Tyre signed on as a member of the PCLA. Although Tyre submitted two declarations discussing the assistance that he received from investigators, difficulties he encountered getting funds approved for investigators and experts, and the application for second counsel, he did not mention the PCLA contract.

Petitioner's state and federal habeas counsel submitted declarations stating that they believed Tyre had been appointed to represent Petitioner under the PCLA contract, but they provided no reasons for that belief. To the contrary, each noted that Tyre expressly denied that he was appointed under the contract.

Additionally, the record contains evidence tending to refute the assertion that the PCLA contract governed Tyre's compensation or remuneration for expenses. For example, Tyre filed motions for funds under California Penal Code § 987.2, for expenses including stationery, travel, phone, photographic materials, medical records, video and audio materials, copying, and scanning costs. The trial court

granted most of those motions in full or in part. But those types of expenses were included in the flat fee of the original PCLA contract, which stated that the contracting attorneys would provide "all legal defense services typically provided by the Office of the Public Defender, including . . . legal research, preparation of documents, secretarial and clerical support services, and travel." Had Tyre been appointed under the PCLA contract, the trial court likely would have denied his requests.

Even if we considered Petitioner's additional declaration, which he did not submit to the California Supreme Court, nothing in that declaration suggests that Tyre was appointed under the contract. Petitioner averred that Tyre never told him that he was appointed under an agreement for legal services and never discussed the PCLA contract. Petitioner asserted that he first heard of the PCLA contract from his federal habeas attorneys. The declaration does not present any additional justification for concluding that Tyre accepted appointment under the PCLA contract.

We therefore hold that the California Supreme Court's summary denial on the merits of Claims 1, 2, 3, and 11 was not unreasonable. *Richter*, 562 U.S. at 97–98.

**AFFIRMED.**

---

BERZON, Circuit Judge, dissenting in part:

I concur in the majority's analysis of Deondre Staten's ("Staten") claims regarding the Pomona Contract Lawyers Association Contract, Part B, and its holding that it was

objectively unreasonable for the California Supreme Court to conclude that Staten's counsel's performance during the guilt phase of the trial was not deficient, Part A.1.  But I dissent from the majority's holding that the California Supreme Court's imputed holding as to whether trial counsel's deficient performance likely prejudiced the outcome of Staten's trial was a reasonable application of clearly established Supreme Court law.  I would hold that there was prejudice under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984), that any conclusion to the contrary was unreasonable, and that 28 U.S.C. § 2254(d) therefore does not preclude habeas relief.

In Staten's state habeas petition, he alleged that his counsel provided ineffective assistance of counsel ("IAC") by failing to investigate and present certain third-party culpability evidence.  In support of this claim, Staten submitted five witness declarations that described members of the East Side Dukes' gang ("the ESD gang") driving by the Statens' house the morning after the murders and behaving "in a way that suggested that they were claiming credit for the murders."  Robert Oseguera, Brian Ellis, and Keith Taylor heard the ESD gang members say "yeah we got them," Pat Oseguera saw the ESD gang members who "seemed to be bragging," and Quincy Murphy described the ESD gang members "giving . . . hard stares" as they drove by.

The opinion explains that Staten's counsel likely "did not recognize the possible significance of the incident [described in the declarations] and failed to investigate it fully," and that any "choice not to make use of readily available evidence, from apparently disinterested witnesses, that would have enhanced his chosen defense theory was unreasonable."  Majority Opinion ("Maj. Op.") at 16–17.  It was therefore

"objectively unreasonable for the California Supreme Court to conclude that [Staten's counsel's] performance was not deficient." Maj. Op. at 18. I agree with that conclusion. But the majority goes on to maintain that a fairminded jurist could decide that the failure to investigate and present third-party culpability evidence did not prejudice Staten. Maj. Op. at 20. On that point, I respectfully disagree.

The case against Staten was based almost entirely on circumstantial evidence. There were no witnesses to the murders; no murder weapon was ever found; blood samples from the crime scene were inconclusive. The evidence Staten introduced in his state habeas filing, if credited, was direct and compelling. Given that contrast, even under the deference to the state courts required under § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the conclusion that the jury would not likely have been swayed had the five witnesses testified to the ESD gang's bravado is not minimally persuasive. As 28 U.S.C. § 2254(d) therefore does not bar federal habeas relief, I would either require supplemental briefing or remand to the district court to consider whether Staten's IAC claim was procedurally defaulted, an issue not adequately briefed on appeal.

# I

## A

Staten filed his petition after the effective date of AEDPA. Under AEDPA, we defer to a state court's decision regarding any claim adjudicated on the merits unless that decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "An unreasonable application must be objectively unreasonable, not merely wrong." *Andrews v. Davis*, 944 F.3d 1092, 1107 (9th Cir. 2019) (en banc) (citation and quotation marks omitted).

To prove his IAC claim, in addition to showing that "counsel's representation fell below an objective standard of reasonableness," Staten must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. *Strickland* "does not require a showing that counsel's actions more likely than not altered the outcome." *Cannedy v. Adams*, 706 F.3d 1148, 1165 (9th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011)). As I agree with the majority's conclusion that it was objectively unreasonable for the state court to determine that Staten's counsel was not deficient in failing to investigate and present the third-party culpability evidence, as well as its explanation for that conclusion, I focus on *Strickland*'s prejudice requirement.

## B

To determine whether counsel's errors prejudiced the outcome of the trial, we "must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Hardy v. Chappell*, 849 F.3d 803, 826 (9th Cir. 2016) (quotation marks omitted). Unlike cases in which the evidence of guilt was

"overwhelming," *see, e.g.*, *United States v. Mikhel*, 889 F.3d 1003, 1046 (9th Cir. 2018); *Murray v. Schriro*, 882 F.3d 778, 825 (9th Cir. 2018), the prosecution's case against Staten was fairly weak, and was based nearly entirely on circumstantial evidence. The prosecutor recognized as much in his opening statement, explaining "I do not necessarily expect to prove to you that Mr. Staten . . . killed these people himself or by himself." A close look at the evidence presented and the culpability evidence that could have been presented confirms that § 2254(d) does not bar federal habeas relief for Staten's IAC claim.

## i

The majority summarizes the facts of the case and describes the evidence most relevant to its holding that Staten was not prejudiced by his counsel's deficient performance. *See* Maj. Op. at 5–11, 20–25. I will not repeat those details here. In my view, the most damaging evidence against Staten included: testimony that Staten had mentioned in conversation with friends getting money from killing his parents;[1] Staten's uncorroborated and questionable alibi that his parents were killed in 15 minutes he was out of the house to get food; and testimony about Faye and Arthur Staten's .38 caliber revolver. Witnesses testified the Statens' .38 revolver was in Deondre's possession on the day of the murders; the prosecution introduced evidence that a .38 revolver could have been used to shoot Arthur Staten; and the Statens' .38 revolver was never found after the murders. This evidence, taken together, amounted to a circumstantial

---

[1] The majority mentions this encounter, Maj. Op. at 5, but does not explain that Staten's two friends, John Nichols and Bishop Higgins, "didn't take [Staten] serious[ly]" and described Staten as "just joking."

case against Staten adequate to support the verdict.  Still, no *direct* evidence connected Staten to the murders.

Troublingly, the majority's prejudice analysis also emphasizes evidence that seems more distracting than convincing.  Although I agree with the majority that we do not view evidence "in the light most favorable to [Staten]," this evidence lacks probative value in any light.  Maj. Op. at 21 n.5.  Evidence the majority relies on that does not merit much, if any, weight in my view includes:

(1) Staten's partial handprint on the mirrored wall below the "ESD kills" graffiti.  This palm print was found in a hallway Staten traveled frequently as a resident of the house.

(2) Blood samples from the crime scene that could have been Staten's.    The blood evidence was relatively vague—this was *not* DNA evidence, but a stipulation from the defense and the prosecution that some blood samples taken from the crime scene "could have" come from Staten and others "could have" come from Faye.  The majority acknowledges that the blood sample tests were "inconclusive."  Maj. Op. at 20.  Also, Staten gave an explanation as to why his blood may have been in the house—that it came from a finger that he cut while trimming the hedges earlier that day.

(3) Neither the detectives nor Staten's aunt could find jeans in Staten's size at his house after the crime, even though Staten frequently wore jeans and was seen in jeans on the day of the murders.  The implication of this evidence seems to be that Staten was wearing jeans when he murdered his parents but disposed of them, along with the murder weapon, before reporting the murders to his neighbors.  But that version of

events would not explain why *none* of Staten's jeans were found at his house.  Staten testified to owning three pairs of jeans, and was known by at least one friend as "501 man" because he wore Levi jeans so often.

(4) Staten told his cousin that it was "time to party and get high" on the night of his parents' funeral.  This statement—which could have been an inappropriate attempt to comfort his crying cousin—did not meaningfully implicate Staten in his parents' murders.  And there was evidence that Staten *was* emotionally affected by his parents' murders—several witnesses testified to seeing Staten upset after over his parents' death.

(5) Staten was seen opening a safe in his parents' bedroom, which one witness described as having "[m]aybe ten inches" of bills, but which Staten described as containing less than 300 dollars and his parents' will.  There is nothing unusual about Staten opening his parents' safe to find their will after their deaths, even if a substantial amount of money was also in the safe.

Considered together, then, the evidence implicating Staten in the murders was fairly weak.  And other evidence introduced at trial supported Staten's innocence.

First, that Arthur Staten was shot but Faye Staten was stabbed to death suggests, as the defense argued and the prosecution acknowledged in its opening statement, that more than one person was likely involved in the murders.  But the jury was never presented with a theory as to who else could or would have helped Staten murder his parents.  Second, numerous witnesses testified that Staten had a very close relationship with his mother, making it unlikely that Staten,

who had no history of violence, would have stabbed her 18 times. Third, Staten did not test positive for gunshot residue on the night of the murders. Finally, the recorded conversation between Staten and his friend John Nichols, described in part by the majority, Maj. Op. at 9, partially supports Staten's defense. Nichols, who was cooperating with the police and wearing a wire, repeatedly asks if Staten was involved in Arthur's and Faye's murders. Over the course of the conversation, Staten says a version of "I didn't do it" five times; explains that he "left to get something to eat," before coming home to find his parents dead; states that he did not have the .38 revolver when his parents returned; and expresses how much he loved his mother, and how upset he was after his parents died.

The majority argues that "in the cases in which [the Ninth Circuit] and the California Supreme Court have concluded that failure to present evidence of third-party culpability was prejudicial," (1) "the omitted evidence was far more compelling than it was here," and (2) "[t]he prosecution's case was . . . weaker." Maj. Op. at 22–23. As discussed below, the omitted evidence here was both compelling and fundamentally different than any other evidence admitted at trial. *See infra*, Section I.B.ii.

As to the strength of the prosecution's case, analogous case law supports the conclusion that the case against Staten was weak. The only Ninth Circuit case the majority discusses to support its position that the prosecution's evidence against Staten was stronger than in analogous cases is *Thomas v. Chappell*, 678 F.3d 1086 (9th Cir. 2012).[2] Maj. Op. at 22.

---

[2] *See infra*, page 40 for discussion of the other case relied on by the majority, *In re Hardy*, 163 P.3d 853, 886–87 (Cal. 2007).

The strength of the evidence against Thomas was, in fact, very similar to that in the case against Staten.

The majority, summarizing the evidence against Staten, states that "the prosecution presented evidence of a motive; testimony placing [Staten] at the scene at the time of the murders; and evidence that, on the day of the murders, [Staten] had been in possession of a firearm that was consistent with the murder weapon." Maj. Op. at 24. In *Thomas*, the jury was presented with evidence that Thomas "possessed a rifle that could have been the murder weapon," that Thomas had fired the rifle the night before the murders, that the rifle had disappeared by the next morning and was never found, and that "[t]he rifle had some peculiarities such that, if a person unfamiliar with the rifle used it, it might jam." 678 F.3d at 1102. The jury also heard that Thomas "asserted that he could think of many motives for killing the victims but declined to offer one when asked," and "was seen with the victims shortly before the likely time of murder . . . [and] appeared angry." *Id.* This Court held that, despite the "circumstantial evidence that cast considerable suspicion upon [Thomas]," the testimony of three additional witnesses supporting "the theory of the alternative credible killer . . . created a reasonable doubt as to [Thomas's] guilt," and so Thomas was prejudiced by his attorney's failure to investigate and present third-party culpability evidence. *Id.* at 1102, 1104, 1106.[3] The similarities between *Thomas* and this case

---

[3] Staten's case is also similar to Thomas's because "the objective clues as to the jury's assessment of the case strongly suggest that the case was close." *Thomas*, 678 F.3d at 1103. Here, the jury deliberated for two days and requested readbacks of certain testimony, which "is an indication that the jury was clearly struggling to reach a verdict." *Id.* (quotation marks and citation omitted). *See also Daniels v. Woodford*, 428 F.3d 1181, 1209–10 (9th Cir. 2005) (holding that "[t]he jury deliberat[ing] for

support the conclusion that Staten was prejudiced by his counsel's deficient performance, and undermine the majority's proposition that cases in which this Court has found evidence of third-party culpability to be prejudicial involved weaker cases by the prosecution.[4]

Not only is this case, in the words of the prosecutor's opening statement, an "entirely circumstantial case" with "no direct evidence," the trial record is notable for the paucity of direct evidence regarding the involvement of the ESD gang. Defense counsel elicited and presented some evidence to support its primary defense—that the ESD gang murdered the Statens. That evidence included that the ESD gang claimed territory bordering the Statens' street and graffitied its name widely and frequently in the Statens' neighborhood; that the ESD gang had a record of confronting African-Americans,[5] and repeatedly painted graffiti stating "ESD Kills Niggers" in the Statens' neighborhood; that the assistant principal at Staten's school had seen "ESD" graffiti in the same style as the spray-painted letters found inside the Statens' house;[6] and

_____

two days before returning a verdict . . . suggests that the jury may have been influenced by [additional] evidence had it been offered"). Notably, the jury requested during their deliberations a transcript of the recorded conversation between Nichols and Staten in which Staten repeatedly denies having anything to do with the murders and maintains that the ESD gang was likely responsible.

[4] *Thomas* did not involve AEDPA deference, and so only considered whether Thomas was prejudiced by his counsel's deficient performance.

[5] Staten and his family are African American.

[6] This testimony contradicted the prosecution's gang expert, who testified that the graffiti found in the Statens' house did not match the style of the ESD gang's graffiti.

that Staten had had several confrontations with the ESD gang. Staten and other witnesses testified that Staten received threatening phone calls from and was shot at by ESD gang members. Defense counsel also emphasized that the police did not conduct a thorough investigation of possible gang involvement before ruling out the ESD gang as suspects. But the defense did not present any evidence, aside from the graffiti in the Statens' house, that directly connected the ESD gang to Arthur and Faye Staten or to their murders.

## ii

As to the importance of the exculpatory evidence that could have been submitted at trial but was not, the evidence Staten presented in his habeas petition of the ESD gang members claiming credit for Arthur's and Faye's murders is fundamentally different from any evidence presented to the jury. I strongly disagree with the majority's assertion that the new evidence "would not have significantly changed the nature of the defense."[7]  Maj. Op. at 22.  Staten presented declarations of five witnesses, all of whom would have testified that they saw members of the ESD gang driving by the Statens' house the morning after the murders. The declarations explained that the ESD gang members were

---

[7] The majority also asserts that the evidence offered in Staten's state habeas petition is less probative because it involved witnesses who "were either not new or not more credible."  Maj. Op. at 23.  For one thing, we cannot know how credible the jury would have found Keith Taylor, who did not testify at Staten's trial.  But more importantly, even if the witnesses would not have been new to the jury, their testimony connecting the ESD gang to the murders would have been.  That these witnesses provided other unrelated testimony does nothing to diminish the probative value of testimony regarding the ESD gang claiming credit for the murders.

"giving . . . hard stares," and three witnesses heard the gang members say "yeah we got them."

Had it been presented at trial, this evidence would have been the only "direct connection between the ESD and the murders" aside from the "ESD kills" graffiti, which the prosecution's gang expert debunked. Maj. Op. at 17. This evidence would therefore not be "cumulative." Maj. Op. at 22. The majority rightly points out that the evidence of ESD gang members' responsibility for the murders did not present a "new theory." Maj. Op. at 21–22. But to say that the defense already had a *theory* about who committed the murders does not mean that critical evidence supporting that theory would not have made it materially more likely that the theory would have been accepted rather than rejected.

Analogous case law, unpersuasively relied on by the majority, confirms that habeas evidence can be prejudicial when it supports the same defense theory presented at trial. *Vega v. Ryan*, 757 F.3d 960, 974 (9th Cir. 2014), for example, held "that the state court's findings that [the victim's priest's] testimony [regarding victim's recantation] would have been cumulative and would have had no effect on the verdict [was] an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," even though the jury had heard evidence that the victim recanted to her mother. In *In re Hardy*, the California Supreme Court held that Hardy was prejudiced by his counsel's deficient performance at the penalty phase because counsel failed to investigate and present third-party culpability evidence, even though counsel's closing argument "made clear that his strategy was to create a reasonable doubt in the minds of the jurors by convincing them it was [a third party]" who committed the murders. 163 P.3d 853, 885, 893 (Cal. 2007).

The majority makes an unhelpful comparison in relying on *In re Hardy* as a case in which the potential impact of third-party culpability evidence was stronger than it was here. Maj. Op. at 23. Although the California Supreme Court concluded that Hardy was prejudiced by his counsel's deficient performance at the penalty phase, that court had held that Hardy was *not* prejudiced by counsel's deficient performance in the guilt phase because of the "ample evidence" that Hardy was a member of the conspiracy and aided and abetted others in the commission of the murders. *In re Hardy*, 163 P.3d at 891. This Court, however, held that conclusion unreasonable and granted habeas relief. *Hardy v. Chappell*, 849 F.3d at 826–27.

The evidence of Hardy's involvement in the conspiracy, which made him as liable for the murders as if he committed them himself, was much stronger than the circumstantial evidence against Staten here. Hardy's girlfriend at the time of the murders testified that Hardy was paid $1,000 for his role in the murders, told her at least twice that he had been to the victims' home the night of the murders, told her and his brother to dispose of a rifle that was allegedly stolen from the victim's house, and told her to destroy a pair of his shoes after he learned that police had discovered a footprint at the crime scene. *Id.* at 862. Despite the strength of this evidence, this Court held, applying AEDPA deferential review, that the California Supreme Court unreasonably applied *Strickland* in holding that Hardy was not prejudiced in the guilt phase by his counsel's deficient performance. *Hardy v. Chappell* held that, had counsel performed competently, "the jury would have been torn between two conflicting theories on the identity of the . . . killer." 849 F.3d at 826.

The same is true here.  Analogously to *Hardy v. Chappell*, the defense in this case rested on the jury believing that the ESD gang could well have murdered Arthur and Faye Staten—not that the gang *did* commit the murders—and so Staten was not guilty beyond a reasonable doubt.  Defense counsel presented no alternative theory of who could have committed the crime and repeatedly emphasized the possible role of the ESD gang throughout the trial.  But the general evidence about the ESD gang's proximity to the Statens and conflict with other African Americans, and even the specific testimony that the ESD gang threatened and harassed Staten, does not compare to direct evidence presented in the habeas declarations that the ESD gang claimed responsibility for Arthur's and Faye's murders.  This evidence is also distinct from the evidence admitted at trial and important to Staten's defense, because it would have countered testimony that the ESD gang denied responsibility for the murders when interviewed by a police investigator.

The prejudicial effect of Staten's counsel's deficient performance must also be considered in conjunction with other third-party culpability evidence Staten's counsel failed to present.  In his state habeas filing, Staten presented the California Supreme Court with evidence that Arthur and Deondre Staten sold drugs in ESD gang territory.  Three witness declarations described Arthur Staten's drug dealing and indicated that his activities caused problems between the ESD gang and the Statens.  Keith Taylor stated that Arthur Staten "advertised that he was a successful drug dealer" by wearing expensive jewelry and clothes and going on

expensive vacations.**[8]**  Brian Ellis and Quincy Murphy also described Arthur Staten buying a new truck and making expensive improvements to the Statens' house and beauty salon with the money he made selling drugs.  Murphy explained that Arthur's and Deondre's drug sales "caused big time problems with the Dukes, who wanted to control the entire drug trade in the area."

This evidence "cannot simply be ignored when assessing prejudice" of Staten's counsel's deficient performance in failing to present critical evidence of third-party culpability. *See Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018). That Staten's counsel made a tactical decision to avoid presenting evidence of Deondre Staten as a gang associate or drug dealer while presenting little direct evidence that the ESD gang was involved does not mean that he would have made the same decision with such evidence, or that the decision would have been reasonable on an expanded record of gang responsibility for the murders.  And evidence that the ESD gang had both a motive to kill Arthur Staten *and* publicly claimed credit for the murders likely would have created reasonable doubt in the mind of the jury.

Despite the hole-ridden case the prosecution presented to the jury and the unique nature of the third-party culpability evidence presented in Staten's habeas petition, the majority concludes that it was reasonable for the California Supreme Court to conclude that the omitted evidence would not have altered the outcome.  I would instead hold that "[w]ith all due respect for our state colleagues, the state court's application

---

**[8]** The fact that Arthur and Faye Staten had recently returned from a trip to Egypt when they were murdered would have supported this testimony.

of *Strickland* was objectively unreasonable." *Vega*, 757 F.3d at 974.

## II

The Government briefly argues that Staten's IAC claim has been procedurally defaulted. Neither the district court nor the majority assesses whether review of Staten's IAC claim has been barred by an "independent and adequate" state procedural rule. Assuming that Staten's IAC claim was barred by an independent and adequate state rule, Staten would have to show cause and prejudice to excuse that procedural default under *Martinez v. Ryan*, 566 U.S. 1, 13–14 (2012), by demonstrating ineffective assistance during the state habeas proceedings resulting in the failure to properly raise a substantial claim of ineffective assistance at trial. I note that establishing cause and prejudice under *Martinez* largely depends on the strength of the underlying claim of trial counsel IAC, *see Clabourne v. Ryan*, 745 F.3d 362, 377–78 (9th Cir. 2014), and, as described in the majority opinion (as to deficient performance) and this dissent (as to prejudice), Staten has quite a strong underlying claim. Still, the issue of procedural default has not been adequately briefed before this court, and Staten's counsel was unprepared to answer questions about procedural default at oral argument. I therefore would either order supplemental briefing on the procedural default issue, or remand to the district court to address the issue of procedural default in the first instance.

For the foregoing reasons, I respectfully dissent. I would hold that § 2254(d) does not bar federal habeas relief for Staten's IAC claim, and order supplemental briefing or remand to the district court for further proceedings.